# In re J-E-, Respondent

*Decided March 22, 2002*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) An alien seeking protection under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment must establish that it is more likely than not that he will be tortured in the country of removal.

(2) Torture within the meaning of the Convention Against Torture and 8 C.F.R. § 208.18(a) (2001) is an extreme form of cruel and inhuman treatment and does not extend to lesser forms of cruel, inhuman, or degrading treatment or punishment.

(3) For an act to constitute "torture" it must satisfy each of the following five elements in the definition of torture set forth at 8 C.F.R. § 208.18(a): (1) the act must cause severe physical or mental pain or suffering; (2) the act must be intentionally inflicted; (3) the act must be inflicted for a proscribed purpose; (4) the act must be inflicted by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) the act cannot arise from lawful sanctions.

(4) According to 8 C.F.R. § 208.16(c)(3) (2001), in adjudicating a claim for protection under Article 3 of the Convention Against Torture, all evidence relevant to the possibility of future torture must be considered, including, but not limited to: (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (3) evidence of gross, flagrant, or mass violations of human rights within the country of removal, where applicable; and (4) other relevant information regarding conditions in the country of removal.

(5) The indefinite detention of criminal deportees by Haitian authorities does not constitute torture within the meaning of 8 C.F.R. § 208.18(a) where there is no evidence that the authorities intentionally and deliberately detain deportees in order to inflict torture.

(6) Substandard prison conditions in Haiti do not constitute torture within the meaning of 8 C.F.R. § 208.18(a) where there is no evidence that the authorities intentionally create and maintain such conditions in order to inflict torture.

(7) Evidence of the occurrence in Haitian prisons of isolated instances of mistreatment that may rise to the level of torture as defined in the Convention Against Torture is insufficient to establish that it is more likely than not that the respondent will be tortured if returned to Haiti.

FOR RESPONDENT: Andrean Eaton, Esquire, Naples, Florida

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: John W. Seaman, Assistant District Counsel

BEFORE: Board En Banc: SCIALABBA, Acting Chairman; DUNNE, Vice Chairman; HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, GRANT, MOSCATO, MILLER, OHLSON, HESS, and PAULEY, Board Members. Dissenting Opinions: SCHMIDT, Board Member, joined by GUENDELSBERGER, BRENNAN, ESPENOZA, and OSUNA, Board Members; ROSENBERG, Board Member, joined by ESPENOZA, Board Member.

GRANT, Board Member:

In a decision dated July 2, 2001, an Immigration Judge found the respondent removable as an alien convicted of a controlled substance violation and as an alien present in the United States without being admitted or paroled. The Immigration Judge denied the respondent's applications for asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3) (2000), and protection under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "Convention"). The respondent has appealed from the Immigration Judge's decision. The appeal will be dismissed. The respondent's request for oral argument is denied, and the request for a fee waiver is granted. *See* C.F.R. §§ 3.1(e), 3.8(c) (2001).

## I. ISSUE

The issue before us is whether the respondent is eligible for protection under Article 3 of the Convention Against Torture. To decide this issue, we must address two questions in particular: first, whether any actions by the Haitian authorities—indefinite detention, inhuman prison conditions, and police mistreatment—constitute torturous acts within the definition of torture at 8 C.F.R. § 208.18(a) (2001); and, if so, whether the respondent has established that it is more likely than not that he will be tortured if removed to Haiti. *See* 8 C.F.R. § 208.16(c) (2001).

## II. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Haiti. He entered the United States without inspection at an unknown time and place.[1] On June 22, 2000, the respondent was convicted of sale of cocaine, a second degree felony under Florida law.

---

[1] According to the respondent's Application for Asylum and Withholding of Removal (Form I-589), he last entered the United States on September 17, 1990.

At a continued removal hearing on July 2, 2001, the respondent testified that upon his return to Haiti he will be persecuted and tortured by Haitian authorities. He related that he left Haiti in 1990, and that his mother was killed in 1990 and his grandfather in 1995, each as a result of a property dispute. The respondent's father, who testified on his son's behalf, explained that his family had never had any problems with the Haitian Government, only property disputes with neighbors. His testimony differed from the respondent's regarding his last trip to Haiti.

In further support of his claim, the respondent submitted five recent newspaper articles addressing Haitian prison conditions, as well as a set of photographs of malnourished, dying Haitian inmates. He also submitted the Department of State's *Background Note: Haiti*, dated April 2001. Bureau of Western Hemisphere Affairs, U.S. Dep't of State, *Background Note: Haiti* (Apr. 2001), *available at* http://www.state.gov/r/pa/bgn/index.htm ("Background Note"). All of the articles confirm the Department of State's assessment of the inhuman prison conditions in Haiti. Only one article, written by a *Miami Herald* reporter in 2001, references police mistreatment. The reporter spoke with two inmates at the Penitentier National prison, who stated that they had been abused by the authorities. One male inmate had burn marks on his chest and arm, and one female inmate claimed that the guard beat her. When confronted with these accusations, the prison warden's response was equivocal. He intimated that prisoners are beaten, but not severely.

The record also contains a letter dated April 12, 2001, to the Immigration Judge from Mr. William E. Dilday, Director of the Office of Country Reports and Asylum Affairs at the Department of State's Bureau of Democracy, Human Rights and Labor. Mr. Dilday reports that Haitians deported from the United States on criminal grounds will be detained in Haiti until a commission determines a release date. The commission does not meet regularly, so Haitian detainees may be held for weeks in police holding cells before they are released. According to Haitian authorities, criminal detainees are temporarily detained to deter criminal activity in Haiti. The State Department also reports that prison facilities are overcrowded and inadequate. Haitian prisoners are deprived of adequate food, water, medical care, sanitation, and exercise. Many prisoners are malnourished. According to prison officials, in November 2000, 5 of the 10 prison deaths were attributable to malnutrition. At the conclusion of the respondent's hearing, the Immigration Judge found him removable as charged; statutorily ineligible for asylum because of his aggravated felony conviction; ineligible for withholding of removal; and ineligible for protection under Article 3 of the Convention Against Torture because of his failure to establish that it is more likely than not that he will be tortured if returned to Haiti. Accordingly, he ordered the respondent deported to Haiti.

On appeal, the respondent claims that he will be persecuted and tortured if returned to Haiti because he will be subject to indefinite detention as a repatriated Haitian convict.[2]  The Immigration and Naturalization Service filed a memorandum adopting the decision of the Immigration Judge and requesting that his decision be affirmed.  For the reasons set forth below, the appeal will be dismissed.

## III.  ANALYSIS

### A. Convention Against Torture

Article 3 of the Convention Against Torture precludes the United States from returning an alien to a state where there are substantial grounds for believing that he would be subjected to torture.[3]  To ascertain the nature and extent of the protection afforded by the United States under Article 3, we must examine the history of the negotiations, ratification, and implementation of the Convention in the United States.

We begin our analysis by examining the origins of the Convention Against Torture.  In 1977, the United Nations General Assembly requested that the United Nations Human Rights Commission draft a convention against torture.  For more than 6 years, several nations, including the United States, negotiated the provisions of the instrument.  In March 1984, a draft convention was accepted by the Commission and was directed to the United Nations General Assembly.  On December 10, 1984, the General Assembly unanimously adopted the Convention Against Torture, which entered into force on June 26, 1987.  *See* Report of the Committee on Foreign Relations, S. Exec. Rep. No. 30, 101st Cong., 2d Sess. 1, 2 (1990) ("Senate Report").  The purpose of the Convention is "to make more effective the struggle against torture and other cruel, inhuman or degrading treatment or punishment throughout the world." Convention Against Torture, *supra*, pmbl.

---

[2]  Although the respondent, through counsel, indicated that he would file an additional brief or statement in support of his appeal, he has failed to provide such a brief or an explanation for his failure to do so.  It is unclear whether the respondent is challenging the denial of his withholding of removal claim under section 241(b)(3) of the Act.  Despite the fact that the respondent withdrew his request for withholding of removal, the Immigration Judge adjudicated the claim and denied it for failure to meet the burden of proof.  On review, we find no reason to disturb that portion of the Immigration Judge's decision.

[3]  Article 3 of the Convention provides as follows:

1. No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2.  For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

The history of the negotiations reveals that a central issue for the drafters of the Convention Against Torture was whether the definition of "torture" should include solely acts of torture or also "other acts of cruel, inhuman, and degrading treatment or punishment." *See* Ahcene Boulesbaa, *The U.N. Convention on Torture and the Prospects for Enforcement* 5 (1999) (citing U.N. Doc. E/CN.4/1314 (1978)). The United States took the position that "torture" is limited to extreme forms of cruel, inhuman, or degrading treatment or punishment. *Id.*; *see also* Senate Report, *supra*, at 2-3. The definition of torture ultimately adopted by the General Assembly and set forth in Article 1 of the Convention Against Torture does not include "other acts of cruel, inhuman or degrading treatment or punishment."[4]

Instead, "other acts of cruel, inhuman or degrading treatment or punishment" are prohibited under Article 16 of the Convention. Article 16.1 obligates Convention signatories to prevent in any territory under their jurisdiction

> other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Thus, the Convention Against Torture draws a clear distinction between torturous acts as defined in Article 1 and acts not involving torture referenced in Article 16. The severity of the pain and suffering inflicted is a distinguishing characteristic of torture.[5] This distinction is further emphasized by the different obligations that attach to each. The obligations undertaken by a State Party regarding acts of torture are far more comprehensive than those regarding nontorturous acts.[6] Notably, the protection afforded under

---

[4]  Article 1 of the Convention defines "torture" as

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

[5]  During the negotiations on the Convention there were several unsuccessful attempts to eliminate the term "severe" from the torture definition. *See* Boulesbaa, *supra*, at 16; *see also* J. Herman Burgers & Hans Danelius, *The United Nations Convention against Torture* 117 (1988).

[6]  For example, as a signatory to the Convention, the United States agreed not to expel, return, or extradite a person to a state where there are substantial grounds for believing that he would be subjected to torture (Article 3). The United States also agreed to criminalize acts of torture (Article 4); to establish universal jurisdiction over acts of torture and to prosecute and extradite

(continued...)

Article 3 extends only to acts of torture as defined in Article 1 of the Convention.

On April 18, 1988, President Reagan signed the Convention Against Torture and transmitted it to the Senate the following month with 17 conditions, which were later revised by the Bush Administration. On October 27, 1990, the Senate adopted its resolution of advice and consent to ratification. The treaty became effectively binding on the United States on November 20, 1994.

The Senate ratified the Convention subject to two reservations, five understandings, two declarations, and a proviso. *See* 136 Cong. Rec. S17,486, S17,491-92 (daily ed. Oct. 27, 1990) ("Senate Resolution"). Two of the Senate's understandings directly relate to Article 3 of the Convention and, consequently, to this case in particular.[7] These understandings, which have been incorporated in the implementing regulations, are critical to comprehending the United States' obligations under Article 3. Notably, the Senate ratified the Convention subject to an understanding that refines the definition of torture contained in Article 1 of the Convention. *See* Senate Resolution, *supra*, II.(1)(a)-(e). As detailed below, this understanding is incorporated into the federal regulations at 8 C.F.R. § 208.18(a).

Another of the Senate's understandings provides that "where there are substantial grounds for believing that he would be in danger of being subjected to torture," as used in Article 3 of the Convention, means "if it is more likely than not that he would be tortured." Senate Resolution, *supra*, II.(2). The ratification history reveals that the standard of proof for protection under Article 3 is the same as the standard of proof for withholding of removal under section 241(b)(3) of the Act. *See* Report of the Committee on Foreign Relations, S. Exec. Rep. No. 30, 101st Cong., 2d Sess., 16-17 (1990) ("Senate Report"). This understanding is incorporated in the federal regulations at 8 C.F.R. § 208.16(c)(2).

## B.  Regulatory Definition of Torture

On October 21, 1998, the President signed into law the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, § 2242, 112 Stat. 2681-761, 2681-822, which authorized the implementation of Article 3 of the Convention Against Torture and required that implementing

---

[6]  (...continued)
alleged torturers (Articles 5, 6, and 7); and to give victims of torture the legal right to receive compensation (Article 14). These obligations do *not* extend to other acts of cruel, inhuman, or degrading treatment or punishment.

[7]  An "understanding" binds only the United States, not other Convention signatories. *See* Restatement (Third) of the Foreign Relations Law of the United States § 314 (1986).

regulations be promulgated by the interested agencies within 120 days.[8]  As directed, the Service promulgated interim regulations implementing Article 3 of the Convention in the context of the removal of aliens by the Attorney General.  Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999) (effective Mar. 22, 1999).

These federal regulations govern our decision in this case.  The regulatory definition of torture incorporates the definition of Article 1 of the Convention and draws directly from the reservations, understandings, declarations, and proviso contained in the Senate's resolution of advice and consent to ratify the Convention, and the ratification documents.   *See* Senate Resolution, *supra*, II.(1)(a)-(e), 4; *see also* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. at 8482-83 (Supplementary Information).  The regulations reflect the United States' longstanding position that torture is an extreme form of cruel, inhuman, or degrading treatment or punishment.  *See* 8 C.F.R. §§ 208.18(a)(1), (2); *see also* Senate Report, *supra*, at 13.

Instead of categorizing acts that constitute torture, the regulatory definition of torture sets forth criteria that must be applied in determining whether a given act amounts to torture.  *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. at 8482.  For an act to constitute torture it must be:  (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions. 8 C.F.R. § 208.18(a).

First, the act must cause *severe* pain or suffering, physical or mental.  It must be an *extreme* form of cruel and inhuman treatment, *not* lesser forms of cruel, inhuman, or degrading treatment or punishment that do not amount to torture.  8 C.F.R. §§ 208.18(a)(1), (2).  Mental pain or suffering may constitute torture if it falls within the regulatory definition at 8 C.F.R. § 208.18(a)(4).  *See* Senate Resolution, *supra*, II.(1)(a).

While the Convention Against Torture makes a clear distinction between torturous and nontorturous acts, actually differentiating between acts of torture and other bad acts is not so obvious.  Although not binding on the United States, the opinions of other governmental bodies adjudicating torture claims can be instructive.

Pursuant to Article 3 of the European Convention on Human Rights, a Contracting State Party may not expel an individual to a country where he would be placed at risk of torture or inhuman or degrading treatment.

---

[8]  Just 2 months earlier, we held that we lacked jurisdiction to adjudicate a claim for relief from deportation pursuant to Article 3 of the Convention Against Torture, in the absence of specific legislation or regulations implementing the provisions of Article 3, given the Senate's declaration that Article 3 is not a self-executing treaty provision.  *Matter of H-M-V*, Interim Decision 3365 (BIA 1998).

European Convention for the Protection of Human Rights and Fundamental Freedoms, *opened for signature* Nov. 4, 1950 ("European Convention"), *available at* http://www.hrcr.org/docs/Eur_Convention/euroconv.html .[9]  In adjudicating such claims, the European Court has differentiated three levels of mistreatment:  torture, inhuman treatment, and degrading treatment.[10]  *See Greek Case*, 12 Y.B. Eur. Conv. on H.R. 1 (1969).

In *Ireland v. United Kingdom*, 2 Eur. Ct. H.R. 25 (1978), the European Court struggled to determine whether the acts complained of constituted torture or other, lesser forms of cruel or inhuman treatment.  It observed that torture is an aggravated and deliberate form of cruel, inhuman, or degrading treatment resulting in intense suffering.  Degrading treatment is characterized by gross humiliation of an individual.  In that case, the court held that suspected terrorists who were detained and subjected to wall standing, hooding, and constant loud, hissing noise, and who were deprived of sleep, food, and drink by the British Army had been subjected to inhuman and degrading treatment, but not torture.

Second, the act must be *specifically intended* to inflict severe physical or mental pain or suffering.  8 C.F.R. § 208.18(a)(5).  This specific intent requirement is taken directly from the understanding contained in the Senate's ratification resolution.  Senate Resolution, *supra*, II.(1)(a).  Thus, an act that results in unanticipated or unintended severity of pain or suffering does not constitute torture.  In view of the specific intent requirement, the Senate Foreign Relations Committee noted that rough and deplorable treatment, such as police brutality, does *not* amount to torture.  *See* Senate Report, *supra*, at 13-14.[11]

Third, the act must have an illicit purpose. The definition of torture illustrates, but does not define, what constitutes a proscribed or prohibited purpose.  Examples of such purposes include the following: obtaining information or a confession; punishment for a victim's or another's act; intimidating or coercing a victim or another; or any discriminatory purpose. The Foreign Relations Committee noted that these listed purposes indicate the type of motivation that typically underlies torture, and it recognized that the illicit purpose requirement emphasizes the specific intent requirement.  *Id.* at 14.

---

[9]  Article 3 of the European Convention provides:  "No one shall be subject to torture or to inhuman or degrading treatment or punishment."

[10]  The European Court of Human Rights was created to hear human rights claims asserted under the European Convention.  The United States is not a party to the European Convention and is not subject to its jurisdiction, and we recognize the differences between the Convention Against Torture and the European Convention.  However, the court's jurisprudence regarding torture claims is instructive, and we consider the court's decisions to be advisory only.

[11]  A deliberate act is not necessarily an intentional act.  *See* Burgers & Danelius, *supra*, at 118-19.

Fourth, torture covers intentional governmental acts, not negligent acts or acts by private individuals not acting on behalf of the government. The regulations require that the harm be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1); *see also Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. 270 (A.G. 2002); *Matter of S-V-*, Interim Decision 3430 (BIA 2000).

To constitute torture, an act must be directed against a person in the offender's custody or control. 8 C.F.R. § 208.18(a)(6). The term "acquiescence" requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity. 8 C.F.R. § 208.18(a)(7). These federal regulations are taken directly from the Senate's understandings upon which ratification was conditioned. *See* Senate Resolution, *supra*, II.(1)(b), (d); *see also Matter of Y-L-, A-G- & R-S-R-*, *supra*; *Matter of S-V-*, *supra*.

Finally, the regulations incorporate the second sentence of Article 1 of the Convention Against Torture, which states that torture "does *not include* pain or suffering *arising only from, inherent in or incidental to lawful sanctions*." 8 C.F.R. § 208.18(a)(3) (emphasis added). "Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture." *Id.*; *see also* Senate Resolution, *supra*, II.(1)(c), (e).

## C. Treatment of Deportees to Haiti

In the case before us, the respondent asserts that he will be tortured in Haiti by the Government because Haitians deported from the United States on criminal grounds are detained indefinitely in prison facilities where prisoners are subjected to inhuman conditions and police mistreatment. We must determine whether any of these state actions—indefinite detention, inhuman prison conditions, and police mistreatment—constitute torturous acts within the meaning of the regulatory definition of torture.

First, the respondent asserts that he will be tortured if returned to Haiti because he will be indefinitely detained by the Haitian authorities. It is undisputed that the respondent will be subject to detention of an indeterminate length on his return to Haiti. Letter from William E. Dilday, Director of Office of Country Reports and Asylum Affairs, Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, to Immigration Judge (Apr. 12, 2001) ("Dilday letter"); Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Haiti Country Reports on Human Rights Practices - 2000* (Feb. 2001), *available at*

http://www.state.gov/g/drl/rls/hrrpt/2000/wha/index.htm, *reprinted in* Committees on Foreign Relations and International Relations, 107th Cong., 1st Sess., *Country Reports on Human Rights Practices for 2000* 2625 (Joint Comm. Print 2001) ("*Country Reports*").[12]    According to the State Department, criminal deportees were once processed and released within 1 week. *Country Reports*, *supra*, at 2630. Now, due to irregular commission meetings, deportees are held for weeks in police holding cells prior to their release. Dilday letter, *supra*.

We recognize that Haiti has a legitimate national interest in protecting its citizens from increased criminal activity. According to the *Country Reports*, this detention procedure is designed "to prevent the 'bandits' from increasing the level of insecurity and crime in the country." *Country Reports*, *supra*, at 2630. This confirms Mr. Dilday's report that Haitian authorities detain criminal deportees "as a warning and deterrent not to commit crimes in Haiti." Dilday letter, *supra*. Thus, Haiti's detention policy in itself appears to be a lawful enforcement sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts committed by Haitians who are forced to return to the country after having been convicted of crimes abroad. We find that this policy is a lawful sanction and, therefore, does not constitute torture. *See* 8 C.F.R. § 208.18(a)(3). Additionally, there is no evidence that Haiti's detention policy is intended to defeat the purpose of the Convention to prohibit torture.

Notwithstanding, the United States has condemned the manner in which Haiti is implementing its detention policy, that is, by detaining deportees for an indeterminate period. Although this practice is unacceptable and must be discontinued, there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering. 8 C.F.R. § 208.18(a)(5). Nor is there any evidence that Haiti's detention procedure is inflicted on criminal deportees for a proscribed purpose, such as obtaining information or a confession; punishment for a victim's or another's act; intimidating or coercing a victim or another; or any discriminatory purpose. 8 C.F.R. § 208.18(a)(1). Based on the foregoing, we find that Haiti's detention practice alone does not constitute torture within the meaning of the regulations.

The respondent asserts that such indefinite detention, coupled with inhuman prison conditions, amounts to torture. In order to constitute torture, the act must be *specifically intended* to inflict severe pain or suffering.  The

---

[12]  According to Director Dilday, Haitian deportees are detained in "police holding cells." Dilday letter, *supra*. The State Department *Country Reports* state that the "National Penitentiary is the only prison originally constructed for use as a prison; all other prisons are former police holding cells." *Country Reports*, *supra*, at 2630. While criminal suspects and convicted criminals are held in "police holding cells," it is unclear from the reports whether Haitian deportees are detained with criminals and are subject to these forms of mistreatment.

ratification documents make it clear that this is a "specific intent" requirement, not a "general intent" requirement. Senate Report, *supra*, at 14; *see also* Senate Resolution, *supra*, II.(a)(1). "Specific intent" is defined as the "intent to accomplish the precise criminal act that one is later charged with" while "general intent" commonly "takes the form of recklessness . . . or negligence." *Black's Law Dictionary* 813-14 (7th ed. 1999).

Although Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard, there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture. *See* 8 C.F.R. §§ 208.18(a)(1), (5). In fact, according to an article submitted by the respondent, it was reported that President Aristide and his wife visited one of the prisons. President Aristide commuted the sentences of seven women in honor of Women's Day and promised to make judicial reform one of his priorities in his 5-year term.

The record establishes that Haitian prison conditions are the result of budgetary and management problems as well as the country's severe economic difficulties. Two thirds of the country's population live in extreme poverty. *Country Reports*, *supra*, at 2626. According to the Department of State, even when the prison authorities purchase adequate food, there is no effective delivery system. *Id.* at 2630. Individual prison officials come to the warehouse, traveling by bus or taxi, and carry away as much food as they can. There is evidence that, although lacking in resources and effective management, the Haitian Government is attempting to improve its prison system.

Additionally, the *Country Reports* state that the Haitian Government "freely permitted the ICRC [International Committee of the Red Cross], the Haitian Red Cross, MICAH [International Civilian Mission for Support in Haiti], and other human rights groups to enter prisons and police stations, monitor conditions, and assist prisoners with medical care, food, and legal aid." *Country Reports*, *supra*, at 2630. The ICRC funds and manages its own programs within the prison system. *Id.* at 2629. Moreover, as evidenced by the respondent's documentary submissions, a reporter and a photographer from the *Miami Herald* were recently given access to Haiti's prisons. For these reasons, we cannot find that these inexcusable prison conditions constitute torture within the meaning of the regulatory definition.

Finally, the respondent bases his torture claim on the likelihood that he will be mistreated by the Haitian authorities while indefinitely detained. The *Country Reports* describe incidents of deliberate mistreatment of detainees:

> Police mistreatment of suspects at both the time of arrest and during detention remains pervasive in all parts of the country. Beating with the fists, sticks, and belts is by far the most common form of abuse. However, international organizations documented other forms of mistreatment, such as burning with cigarettes, choking, hooding, and kalot marassa (severe boxing of the ears, which can result in eardrum damage). Those who reported such

abuse often had visible injuries consistent with the alleged maltreatment. There were also isolated allegations of torture by electric shock. Mistreatment also takes the form of withholding medical treatment from injured jail inmates. Police almost never are prosecuted for the abuse of detainees.

*Country Reports*, *supra*, at 2629.

This single paragraph in a 15-page report documents many forms of mistreatment which can be categorized as either torturous or nontorturous acts. Instances of police brutality do not necessarily rise to the level of torture, whereas deliberate vicious acts such as burning with cigarettes, choking, hooding, kalot marassa, and electric shock may constitute acts of torture. As noted above, the distinguishing characteristic of torture is the severity of the pain and suffering inflicted. The record reflects that there are isolated instances of mistreatment in Haitian prisons that rise to the level of torture within the meaning of 8 C.F.R. § 208.18(a).

## D. Burden of Proof

As a "vigorous supporter of the international fight against torture," the United States views any incident of torture as unacceptable. *U.S. Department of State Initial Report of the United States of America to the UN Committee Against Torture*, (Oct. 15, 1999), *available at* http://www.state.gov/www/global/human_rights/torture_intro.html. Indeed, in ratifying the Convention Against Torture, the United States agreed to take effective measures to prevent acts of torture in any territory under its jurisdiction. *See* Convention Against Torture, *supra*, art. 2. In the context of these removal proceedings, the United States agreed not to remove an alien to a country in which it is more likely than not that he or she would be tortured. *See* Convention Against Torture, *supra*, art. 3.

The question before us is whether the respondent has established his eligibility for protection under Article 3 of the Convention. The respondent bears the burden of proving that it is more likely than not that he will be tortured if returned to Haiti. The respondent's testimony, if credible, may be sufficient to sustain the burden of proof without corroboration. *See* 8 C.F.R. § 208.16(c)(2).

As noted, the ratification history of the Convention underscores the concept that the standard of proof for protection under Article 3 is the same as the standard of proof for withholding of removal under section 241(b)(3) of the Act. *See INS v. Stevic*, 467 U.S. 407 (1984). The "more likely than not" standard of proof has no subjective component, but instead requires the alien to establish, by objective evidence, that it is more likely than not that he or she will be subject to torture upon removal. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987).

In assessing whether it is more likely than not that an alien would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to: (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (3) evidence of gross, flagrant, or mass violations of human rights within the country of removal, where applicable; and (4) other relevant information regarding conditions in the country of removal. 8 C.F.R. § 208.16(c)(3).

The United Nations Committee Against Torture[13] has consistently held that the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute sufficient grounds for determining that a particular person would be in danger of being subjected to torture upon his return to that country. Specific grounds must exist that indicate the individual would be personally at risk. At the same time, the absence of such human rights violations does not preclude an individual from establishing eligibility for protection under the Convention. *See Mutombo v. Switzerland*, Comm. No. 13/1993, CAT/C/12/D/13/1993 (Apr. 27, 1994); *see also Matter of S-V-*, *supra*, at 9.

The respondent has made no claim of past torture. His torture claim is premised on the mistreatment he would face while detained for an indeterminate period on returning to Haiti. Neither he nor his father had personal knowledge of Haitian prison conditions. The respondent's evidence consists of five newspaper articles, the Department of State *Country Reports*, and a letter from a State Department official. This documentary evidence contains only two references to police mistreatment, as the *Miami Herald* reporter who was given access to the Haitian prisons reported two complaints of police misconduct. In addition, the Department of State reported only isolated allegations of misconduct that rise to the level of torture.

The evidence establishes that isolated acts of torture occur in Haitian detention facilities. However, this evidence is insufficient to establish that it is more likely than not that the respondent will be subject to torture if he is removed to Haiti. For example, there is no evidence that deliberately inflicted acts of torture are pervasive and widespread; that the Haitian authorities use torture as a matter of policy; or that meaningful international oversight or intervention is lacking. Additionally, the United States has urged the Aristide administration to discontinue this detention practice.

---

[13]  The United Nations Committee Against Torture is a monitoring body for the implementation and observance of the Convention Against Torture. Convention Against Torture, *supra*, arts. 17-22. The United States recognizes the Committee but does not recognize its competence to consider cases brought by one state party against another or cases brought by an individual against a state party. *See* Senate Resolution, *supra*, III.(2). We therefore consider the Committee's opinions to be advisory only.

On the basis of this evidence, we find that the respondent has failed to establish that these severe instances of mistreatment are so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture, as opposed to other acts of cruel, inhuman, or degrading punishment or treatment. *See, e.g.*, *Al-Saher v. INS*, 268 F.3d 1143 (9th Cir. 2001) (finding an Iraqi national eligible for protection under Article 3 of the Convention where he established that he was likely to be detained by the Iraqi authorities, and the record indicated that the security services *routinely* tortured detainees and that Iraqi refugees *often reported* instances of torture).

As we read the State Department *Country Reports* in their entirety, it is clear that most of the range of mistreatment described therein falls outside the scope of Article 1 of the Convention, while fitting squarely within Article 16 of the Convention. Nothing could be clearer from the language of the Convention, the Senate ratification documents, and the implementing regulations than that the nonrefoulement obligation of Article 3 does not apply to most of the abysmal conditions described in the *Country Reports*. It bears repeating that although these prison conditions do not rise to the level of torture, every effort must be made to improve such conditions.

## IV. CONCLUSION

As the foregoing discussion demonstrates, the regulations implementing the Convention Against Torture, drawn directly from the language of the Convention and the Senate's resolution of ratification, govern our analysis and decision regarding Article 3 claims for protection. In applying these regulatory standards to the evidence before us, we cannot find that the respondent has established that it is more likely than not that he will be tortured if he is returned to Haiti. Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

*DISSENTING OPINION:* Paul Wickham Schmidt, Board Member, in which John W. Guendelsberger, Noel Ann Brennan, Cecelia M. Espenoza, and Juan P. Osuna, Board Members, joined

I respectfully dissent.

The respondent more likely than not will be tortured upon return to Haiti. Therefore, we should sustain his appeal and grant him deferral of removal under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or

"Convention"), and the implementing regulations.  *See* 8 C.F.R. §§ 208.16-208.18 (2001).

## I.  ISSUE

This case involves an important issue of mandatory protection under the Convention Against Torture, an international instrument to which our country is a party.  The respondent is a removable Haitian national who committed a crime in the United States.  It is undisputed that, as a returning criminal, the respondent will be detained by the Haitian Government for an indeterminate period, during which he is likely to be subject to mistreatment at a level that has been condemned by our Government.

The issue is whether the respondent has shown that it is "more likely than not" that he will be "tortured" upon return to Haiti.  The respondent meets this standard.

## II.  DEFINITION OF TORTURE

The regulations define "torture" as follows:

> Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

Torture "is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2). We are directed to consider all relevant evidence including evidence "of gross, flagrant or mass violations of human rights within the country of removal, where applicable." 8 C.F.R. § 208.16(c)(3)(iii).

The standard of proof is "more likely than not."  8 C.F.R. § 208.16(c)(2). Deferral of removal for those covered by the Convention is mandatory, and there are no exceptions.  8 C.F.R. § 208.17(a).  This means that we are compelled by law to defer removal of anyone  who shows that it is more likely than not that he or she would be subjected to torture, even if that person has engaged in serious criminal activity.

The reasoning behind this absolute prohibition is plain:  torture is so abhorrent that it can never be justified, and its application is "outside the domain of a criminal justice system." *Suresh v. Canada*, [2002] S.C.R. 1, 12 (noting that "[t]orture is an instrument of terror and not of justice").  This

prohibition on torture is a principle that has attained the status of a peremptory norm in international law. *Id.* at 13. The corollary of that principle is that removal of an individual to a country where he or she would be tortured can never be justified. *See* 8 C.F.R. § 208.17(a); David Weissbrodt & Isabel Hortreiter, *The Principle of Non-refoulement: Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment in Comparison with the Non-Refoulement Provisions of Other International Human Rights Treaties*, 5 Buff. Hum. Rts. L. Rev. 1, 16 (1999) (pointing out that "no exceptional circumstances justify expelling a person to a country where he or she would be in danger of being subjected to torture," and that the drafters of Article 3 of the Convention Against Torture deliberately did not adopt the limitations on nonrefoulement included in other treaties, such as the "particularly serious crime" limitation on nonrefoulement included in Article 33(1) of the 1951 Convention Relating to the Status of Refugees).

Therefore, if we conclude that the conditions in Haiti to which the respondent would be returned constitute torture, and if the respondent establishes that it is more likely than not that he would be subjected to that torture, we must defer his removal, despite his serious criminal record.

## III. EVIDENCE

The record contains the 2001 Department of State *Country Reports*. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Haiti Country Reports on Human Rights Practices - 2000* (Feb. 2001), *available at* http://www.state.gov/g/drl/rls/hrrpt/2000/wha/index.htm *reprinted in* Committees on Foreign Relations and International Relations, 107th Cong., 1st Sess., *Country Reports on Human Rights Practices for 2000* 2625 (Joint Comm. Print 2001) ("*Country Reports*"). The report confirms that "many criminal deportees who already served full sentences overseas are put back in jail for indefinite periods of time." This describes the respondent.

The *Country Reports* further describe how detainees are mistreated:

> Police mistreatment of suspects at both the time of arrest and during detention remains pervasive in all parts of the country. Beating with the fists, sticks, and belts is by far the most common form of abuse. However, international organizations documented other forms of mistreatment, such as burning with cigarettes, choking, hooding, and kalot marassa (severe boxing of the ears, which can result in eardrum damage). Those who reported such abuse often had visible injuries consistent with the alleged maltreatment. There were also isolated allegations of torture by electric shock. Mistreatment also takes the form of withholding medical treatment from injured jail inmates. Police almost never are prosecuted for the abuse of detainees.

*Country Reports*, *supra*, at 2629.

The respondent also submitted a number of newspaper articles describing the deplorable conditions in Haitian prisons. One article, acknowledged by

the majority, chronicles widespread official mistreatment and contains accounts by inmates who were beaten and burned, as well as a response in which the warden basically admits that inmates are beaten but tries to minimize the severity of the beatings.

Inmates receive "insufficient calories to sustain life." "Corruption, not just malnutrition, is killing inmates," bluntly states one report. Another article tells of a returnee from the United States who was dumped in a police substation detention cell "unfit for human habitation." She was denied food and potable water and died after 4 days. Overall, these squalid, inhuman conditions describe an atmosphere in which unchecked, officially sanctioned abuse of the type highlighted in the State Department *Country Reports* is likely to be the rule, not the exception.

Of particular importance in determining whether the respondent has met his burden of proof is the apparent blanket policy of the Haitian authorities to automatically detain all criminal returnees to Haiti. As the majority concedes, it is undisputed that the respondent will be detained upon his return to Haiti. According to the State Department, this detention may last many weeks.

Thus, it appears that the respondent has shown that he falls in the class of persons who are guaranteed to be subjected to the treatment at issue in this case. If we conclude that such treatment rises to the level of torture, the respondent has therefore met his burden of proof.

## IV. ANALYSIS

Clearly, the abuse documented in the record is extreme, deliberate, cruel, and intentionally inflicted to cause severe pain and suffering. It fits squarely within the regulatory definition of torture. *See* 8 C.F.R. § 208.18(a)(1).

The majority errs by concluding that because the Haitian authorities do not have a specific intent to subject returnees to severe physical or mental pain or suffering, the treatment does not rise to the level of torture. These authorities have continued the policy of detaining returnees with the full knowledge, as documented by the State Department and international organizations, that returnees will be forced to endure horrific prison conditions as well as starvation, beatings, and other forms of physical abuse.

This is not a case where the authorities merely are being negligent. *See* J. Herman Burgers & Hans Danelius, *The United Nations Convention Against Torture* 118 (1988) (noting that where the pain or suffering is the result of an accident or mere negligence, it is not torture). Rather, it is an instance of a government deliberately continuing a policy that leads directly to torturous acts.

The Government of Haiti cannot claim that it does not know what happens to detainees in its prisons. Therefore, its conduct falls squarely within the meaning of 8 C.F.R. § 208.18(a)(1).

Beatings with sticks, fists, and belts have no legitimate purpose and obviously are specifically intended to inflict extreme pain and suffering upon the victims. Burning with cigarettes, choking, hooding, and kalot marassa are not accidental occurrences, nor are they the result of lack of resources or mere mismanagement in a poor country's prison system. Rather, they are well-recognized ways in which torturers torment their victims. Electric shock, in this case, is intentionally applied to cause excruciating pain and prolonged physical and mental anguish.

The *Country Reports* do not purport to provide a statistical analysis of the odds on torture in Haiti. Indeed, given the international condemnation of torture, there is every incentive for the Haitian Government to conceal or minimize the evidence of torture occurring in its detention system. It is likely, therefore, that the *Country Reports* substantially understate the actual number of instances and severity of torture.

What is striking, however, is the clearly documented acceptance of extreme mistreatment amounting to torture as a routine aspect of detention in Haiti. Even the prison warden freely admits to a reporter that systematic beatings occur; he merely attempts to minimize the severity of the misconduct for which he is responsible. This confirms the State Department's report that torture by government officials is carried out with impunity.

Few, if any, prospective torture victims will be able to provide "statistical proof" of a "50.001% chance" of torture. But the information in the *Country Reports* shows that torture of detainees in Haiti is routine, widespread, horrific, and officially tolerated. This satisfies a reasonable, common-sense application of the "more likely than not" standard for protection under the Convention.

The Senate Report cited by the majority specifically states that "sustained systematic beatings" constitute "torture." Report of the Committee on Foreign Relations, S. Exec. Rep. No. 30, 101st Cong., 2d Sess. 1, 14 (1990). I disagree with the majority's attempt to characterize certain aspects of the systematic, aggravated abuse documented in the *Country Reports*—beating with fists, sticks, and belts—as mere "rough treatment" or "police brutality."

The majority's characterization of the Haitian Government's practice of detaining returning Haitian citizens as a "lawful sanction" is also unusual. Such citizens of Haiti committed crimes in the United States, completed their sentences here, and have committed no apparent crimes in Haiti that would earn them such "sanctions." Moreover, their detention has been condemned by our Government. Furthermore, torture can never be a "lawful sanction." *See* 8 C.F.R. § 208.18(a)(3) (stating that lawful sanctions do not include sanctions that defeat the object and purpose of the Convention).

In essence, the majority errs by looking at the various factors that contribute to the abuse of Haitian returnees in isolation, and not as a whole. Generally, deplorable prison conditions, by themselves, do not rise to the level of torture, although they can rise to the level of cruel, inhuman, and degrading treatment. *See* Amnesty International, *Haiti: Unfinished Business: justice and liberties at risk*, AI Index: AMR 36/01/00, at 9 (Mar. 21, 2000) (noting that the physical conditions in Haitian prisons give rise to cruel, inhuman, and degrading instances).[1]

In this case, however, we must examine not only the prison conditions, but also the effect on someone who, while having to endure those deplorable conditions, has to endure various forms of physical abuse, including beatings, electric shock, burning with cigarettes, choking, and other forms of mistreatment, as well as the withholding of food and medical treatment, in an atmosphere where his abusers act with almost complete impunity. It is only by looking at this entire picture that we can be faithful to the mandate in the regulations that we consider "all evidence relevant to the possibility of future torture." 8 C.F.R. § 208.16(c)(3).

## V. CONCLUSION

The majority concludes that the extreme mistreatment likely to befall this respondent in Haiti is not "torture," but merely "cruel, inhuman or degrading treatment." The majority further concludes that conduct defined as "torture" occurs in the Haitian detention system, but is not "likely" for this respondent. In short, the majority goes to great lengths to avoid applying the Convention Against Torture to this respondent.

We are in the early stages of the very difficult and thankless task of construing the Convention. Only time will tell whether the majority's narrow reading of the torture definition and its highly technical approach to the standard of proof will be the long-term benchmarks for our country's implementation of this international treaty.

---

[1] The majority's reliance on the European Court's decision in *Ireland v. United Kingdom*, Eur. Ct. H.R. 25 (1978), is of only limited value. While the Court did generally hold that prison conditions may constitute cruel, inhuman, and degrading treatment, but not torture, the context of that decision is vastly different from the present case. The European Court was examining conditions in prisons in the United Kingdom, not Haiti. Moreover, the court was reviewing the treatment of suspected terrorists whose detention was carried out according to strict guidelines on how to treat detainees, not a blanket and indiscriminate detention policy as now exists in Haiti. When those guidelines were violated, guards were prosecuted for abuse of detainees. In Haiti, there is near total impunity. The State Department notes that international human rights observers and prison officials admit that there is abuse by guards against prisoners, but that prisoners are afraid to file official complaints for fear that the abuse may get worse. *Country Reports*, *supra*, at 2630.

Although I am certainly bound to follow and apply the majority's constructions in all future cases, I do not believe that the majority adequately carries out the language or the purposes of the Convention and the implementing regulations.  Therefore, I fear that we are failing to comply with our international obligations.

I conclude that the respondent is more likely than not to face officially sanctioned torture if returned to Haiti.  Therefore, I would grant his application for deferral of removal under the Convention Against Torture and the implementing regulations.  Consequently, I respectfully dissent.

*DISSENTING OPINION*:  Lory Diana Rosenberg, Board Member, in which Cecelia M. Espenoza, Board Member, joined

"Among the rights universally proclaimed by all nations . . . is the right to be free of physical torture.  Indeed, for purposes of civil liability, the torturer has become like the pirate and slave trader before him hostis humani generis, an enemy of all mankind."  *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980).  Although articulated in the context of a civil action brought under the Alien Tort Claims Act, 28 U.S.C. § 1350, these same rights—as well as the right to be free of severe mental pain and suffering—are insured under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "Convention"), and the implementing regulations by which we are bound.  *See* 8 C.F.R. § 208.17(a) (2001) (stating that "an alien who . . . has been found under § 208.16(c)(3) to be entitled to protection under the Convention Against Torture . . . shall be granted deferral of removal").

Notwithstanding this mandatory prohibition on the return of an alien to circumstances in which he or she is more likely than not to be tortured, the majority concludes that the respondent, a potential victim of severe physical and mental abuse in the Haitian jails, does not qualify for protection. The majority opinion construes the Senate Reservations that were issued in the course of ratification of the Convention, and the subsequent regulations governing our implementation of the provisions of the Convention Against Torture, to  restrict, rather than extend, protection to such potential victims.

I take issue with this approach, which I fear can only lead to a derogation and not a meaningful implementation of our obligations under the Convention Against Torture.[1]  Considering the limitations adopted by the majority in this

---

[1]  *See* Louis Henkin, *Foreign Affairs and the United States Constitution* 200-02 (2d ed. 1996) (questioning the policy of attaching reservations, understandings, and declarations to

(continued...)

case, I find it difficult to conceive of the circumstances in which an individual might qualify for our protection, as there will always be some basis for disqualification. It is no secret that Congress was not pleased with being obligated to extend protection to persons, including those with criminal convictions, who are barred from eligibility for asylum and withholding of removal.[2] But the very terms of the Convention that the Senate ratified require us to protect such individuals from the probability of torture, no matter how undesirable they may be and "notwithstanding the prior criminal offenses." *Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. 270, 279 (A.G. 2002) (recognizing that "[a]lthough the respondents are statutorily ineligible for *withholding* of removal . . . the regulations . . . allow them to obtain a deferral of removal . . . if they can establish they are 'entitled to protection' under the Convention).

Accordingly, I join the dissenting opinion of Board Member Schmidt. I agree that "[t]he issue is whether the respondent has shown that it is 'more likely than not' that he will be 'tortured' upon return to Haiti" and that, based on the evidence in the record, "[t]he respondent meets this standard." *Matter of J-E-*, 23 I&N Dec. 291, 305 (BIA 2002) (Schmidt, dissenting). I write separately to address certain aspects of the majority opinion concerning the legal issues relating to the definition of "torture," the requirement that the torturous act be "specifically intended" by the torturer, and the burden of proof borne by the potential torture victim.

## I. ISSUE

I concur with the articulation of the issue offered by Board Member Schmidt in his dissenting opinion. The question is whether the respondent has shown that it is more likely than not that he will suffer torture because he is a convicted criminal who, on return to Haiti, will be placed in a Haitian prison where prisoners are deprived of adequate food, water, exercise, sanitation, and medical care and are subjected to pervasive mistreatment, including beatings, burning, choking, hooding, ear-boxing, and instances of electric shock.

This case does not present the broader issue—posited by the majority—of whether "any actions by the Haitian authorities," including police

---

[1] (...continued)
international treaties).

[2] *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, § 2242(c), 112 Stat. 2681-761, 2681-822—which provides in pertinent part as follows:

> EXCLUSION OF CERTAIN ALIENS.—To the maximum extent consistent with the obligations of the United States under the Convention . . . the regulations described in subsection (b) shall exclude from the protection of such regulations aliens described in section 241(b)(3)(B) of the Immigration and Nationality Act (8 U.S.C. § 1231(b)(3)(B)).

mistreatment, constitute torture. *Matter of J-E-*, *supra*, at 292. In addition, there is no dispute that it is officials of the Haitian Government who are the perpetrators of the potential torture asserted by the respondent. Contrary to the majority opinion, the issue is not whether jailing Haitian returnees who have criminal convictions is a lawful sanction that Haiti may elect to impose. That may be. Nonetheless, it is the allegedly deliberate torture to which the respondent is likely to be subjected while jailed that is at issue.

Furthermore, the regulations require that each claim for protection under the Convention be evaluated on an individual, case-by-case basis. 8 C.F.R. § 208.16(c)(3) (2001). Therefore, even if the respondent's case fails, as an evidentiary matter, it is not possible to draw broad conclusions concerning the treatment of all returned Haitians who have been convicted abroad.

## II. ELEMENTS OF A CONVENTION AGAINST TORTURE CLAIM

The United States Court of Appeals for the Eleventh Circuit, in which this case arises, has recognized that, "[i]n making out a claim under CAT, '[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Najjar v. Ashcroft*, 257 F.3d 1262, 1303 (11th Cir. 2001) (quoting 8 C.F.R. § 208.16(c)(2)). The "more likely than not" standard was addressed in *INS v. Stevic*, 467 U.S. 407, 430 (1984), as "a familiar one to immigration authorities and reviewing courts."

By its terms, the "more likely than not" standard requires evidence of a greater than 50% chance that an event will occur. See *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987), in which the Supreme Court differentiated the "more likely than not" standard from a less stringent standard, ruling that "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." Thus, the "more likely than not" standard requires the proponent to establish the elements of his claim by a preponderance of the evidence.

The "preponderance of the evidence" standard, applied in most civil cases, requires a lesser quantum of proof than either the "clear and convincing" standard or the "beyond a reasonable doubt" standard used in criminal proceedings. *Matter of Patel*, 19 I&N Dec. 774, 783 (BIA 1988) (citing *Addington v. Texas*, 441 U.S. 418, 425 (1979)). The burden of showing something by a preponderance of the evidence "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (quoting F. James, *Civil Procedure* 250-251 (1965)). "Unlike other standards of proof such as

reasonable doubt or clear and convincing evidence, the preponderance standard 'allows both parties to share the risk of error in roughly equal fashion' . . . ." *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 (1997) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983)); *see also Addington v. Texas*, *supra*, at 423.

Moreover, it is critical to recognize that the protection afforded under the Convention Against Torture relates to prospective mistreatment that can be found more likely than not to rise to the level of severe physical or mental pain and suffering. In assessing whether this standard is met, we do not have the benefit of an accomplished act to examine. Rather, we must draw inferences about what may happen in the future and the reasons it may occur.

## A. Torture

The first question is: What is torture? "Torture is universally and unequivocally prohibited in international law." Karen Musalo, *Irreconcilable Differences? Divorcing Refugee Protections from Human Rights Norms*, 15 Mich. J. Int'l L. 1179, 1210 (1994). "[T]he law of nations contains a 'clear and unambiguous' prohibition of official torture." *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1541 (N.D. Cal. 1987) (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 880 (2d Cir. 1980); *see also Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) ("The crack of the whip, the clamp of the thumb screw, the crush of the iron maiden, and, in these more efficient modern times, the shock of the electric cattle prod are forms of torture that the international order will not tolerate.").

Torture has long been abhorred by the American judicial system. In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court observed that the Eighth Amendment to the Constitution reflects "the primary concern of the drafters . . . to proscribe *'torture(s)'* and other 'barbar(ous)' methods of punishment." *Id.* at 102 (emphasis added) (quoting Granucci, *Nor Cruel and Unusual Punishment Inflicted: The Original Meaning*, 57 Calif. L. Rev. 839, 842 (1969)). Over a century ago, the Court recognized that "it is safe to affirm that *punishments of torture . . . and all others in the same line of unnecessary cruelty*, are forbidden by that amendment." *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878).

Certainly, it is not the Eighth Amendment, but the definition of "torture" under the Convention Against Torture that controls our determination. *See* 8 C.F.R. § 208.18(a) (2001). Undeniably, the Eighth Amendment more broadly encompasses mistreatment of criminals and suspects that need not rise to the level of torture as defined in the Convention. See *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999), in which the Eleventh Circuit found that "[o]ur cases, too, have recognized that prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain"

(citing *Brown v. Hughes*, 894 F.2d 1533 (11th Cir.1990)). Cases that would trigger Eighth Amendment protection need only be those that constitute cruel, inhuman, or degrading treatment or punishment under Article 16 of the Convention and need not amount to torture under Article 3. Nevertheless, we cannot ignore the fact that our courts have addressed "torture" in the context of finding violations of the Eighth Amendment.

The concept of "torture" also has long been invoked in our civil jurisprudence. In *Blanchard v. Morris*, 15 Ill. 35 (Ill. 1853), *available at* 1853 WL 4779, *1, the Illinois Supreme Court recognized that whether or not a defendant's recovery of a $700 judgment was excessive depended the circumstances of the particular case, holding that the "threats, violence and imprisonment [imposed to make the offender confess] were accompanied by mental fear, torture and agony of mind." More recently, in upholding a downward departure of a prescribed sentence for a criminal act, the Eleventh Circuit accepted the notion that a parole examiner's determination that "both petitioners had *endured extremely harsh prison conditions* in the Bahamas, and *beatings by guards*" was an appropriate basis on which to downwardly depart from the prescribed sentence. *Tramel v. United States Parole Comm'n*, 100 F.3d 129, 131 (11th Cir. 1996) (emphasis added). Notably, in *Tramel*, the examiner determined that the "beatings by guards . . . amounted to torture." *Id.*

The line drawn between torture and ill-treatment that is cruel, inhuman, or degrading is significant. *See* Evelyn Mary Aswad, *Torture by Means of Rape*, 84 Geo. L.J. 1913, 1916 (1996) ("International law explicitly grants more protections and remedies to torture survivors than to survivors of ill-treatment."). Aswad explains:

> [I]n the United States, the Torture Victim Protection Act of 1991 ("TVPA") permits torture survivors, but not survivors of ill-treatment, of any nationality to bring civil suits for damages in U.S. courts against the individuals who tortured them. Aliens who are survivors of torture may also sue both the governments and individuals who tortured them under the Alien Tort Claims Act of 1789 ("ATCA").

Aswad, *supra*, at 1918.[3]

In general, the authorities have agreed that the distinction between torture and inhuman, degrading treatment is a matter of degree, based primarily on the severity of the pain and suffering caused. Deborah E. Anker, *Law of Asylum in the United States* 465, 482 (3d ed. 1999) (citing Walter Suntinger, *The Principle of Non-Refoulement: Looking Rather to Geneva than to Strasbourg?*, 49 Austrian J. Pub. Int'l. 203, 212 (1995)). As Professor Anker points out in her treatise, in 1969 the European Commission of Human Rights ("European Commission") articulated the distinction between torture and ill

---

[3] Notably, the definition of "torture" in the TVPA is almost identical to that in the Convention Against Torture.

treatment of political prisoners, stating that "[t]orture . . . is generally an aggravated form of inhuman treatment." Anker, *supra*, at 485 (quoting *Greek Case*, 1969 Y.B. Eur. Conv. on H.R. 1, 186 (Eur. Comm'n on H.R)). Thus, torture has been defined as an *aggravated* form of inhuman treatment imposed with an illicit purpose. *See* Aswad, *supra*, at 1923. Contrary to the majority's reliance on *Ireland v. United Kingdom* as a vehicle for dismissing the ill-treatment of prisoners as merely inhuman, degrading treatment rather than torture, *Ireland* simply distinguished suffering that "'did not occasion suffering of the particular intensity and cruelty implied in the word torture.'" Anker, *supra*, at 483 (quoting *Ireland v. United Kingdom*, 25 Eur. Ct. H.R. (ser. A) ¶ 167 (1978)).

The question remains: What is torture? In *Wilson v. Seiter*, 501 U.S. 294 (1991), our Supreme Court affirmed that "the denial of medical care is cruel and unusual *because, in the worst case, it can result in physical torture.*" *Id.* at 308 (emphasis added) (citing *Estelle v. Gamble*, *supra*). Yet the majority decision would categorically deny protection even in the face of beatings by prison guards that our courts have found, in other contexts, to amount to torture. The majority would characterize such abuse as "police brutality" not covered by the Convention. *Matter of J-E-*, *supra*, at 302. It does not take much imagination to see that the restrictive interpretation proposed by the majority would not only deny protection from severe police brutality, but would categorically reject the denial of medical care as an indicator of torture, even where such denial amounted to torture under the reasoning in *Wilson v. Seiter*, *supra*. Such a restrictive definition of torture is contrary to both international and domestic interpretations of the term.[4]

## B. Intent

The next question is: What level of intent is required to find that there is a probability of torture? Under the Convention Against Torture, torture is distinguished from ill-treatment that is inhumane and degrading by its deliberate nature as well as its severity. The Senate conditioned its advice and consent to the Convention on its understanding that "*with reference to Article 1, . . . in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering.*" 136 Cong. Rec. S17,486, S17,491-92 (daily ed. Oct. 27, 1990) ("Senate Resolution" II.(1)(a)).

All that the Senate understanding indicates is that the torture that might be imposed must not be accidental, i.e., that it would be "deliberate," as described in most authoritative interpretations of the Convention's terms. Contrary to what the majority suggests, the regulatory requirement that the

---

[4] *See Beharry v. Reno*, 183 F. Supp. 2d 584, 599 (E.D.N.Y. 2002) (collecting Supreme Court cases recognizing the need to harmonize domestic and international law).

torture be "specifically intended" does not mean that proof of specific intent, as that term is used in American criminal prosecutions, is required. *See* Anker, *supra*, at 486 (citing J. Hermann Burgers & Hans Danelius, *The Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* 41 (1988)); *see also* Keith Highet, et al., *British Commonwealth Case Note*, 88 Am. J. Int'l L. 775 , 778-79 (1994) (clarifying that *Ireland v. United Kingdom*, *supra*, put to rest any impression that proof of a specific intent was required).

The majority's reading of the regulations functionally converts the Senate understanding that torture must be specifically intended into a "specific intent" requirement. I disagree. I can find no basis to conclude that the Senate understanding was intended to require proof of an intent to accomplish a precise criminal act, as the majority contends is required. *See Matter of J-E-*, *supra*, at 301 (defining "specific intent"). Rather, the plain language of the text of 8 C.F.R. § 208.18(a)(5) reflects only that something more than an accidental consequence is necessary to establish the probability of torture. *Id.* (stating plainly that unanticipated or unintended pain and suffering that is severe enough to constitute torture is not covered). Moreover, 8 C.F.R. § 208.18(a)(4) states that a *threat* of infliction of severe physical pain or suffering may amount to torture.

Nowhere does the regulation state that the respondent must prove that the prospective torture he may face will result from the torturer's specific intent to torture him. Indeed, it would be difficult, if not impossible, to prove specific intent in a prospective context. In her article addressing the difficulty in proving intent in the asylum context, Professor Musalo emphasizes that "[e]ven under the best of circumstances, the motivation and state of mind of another individual are difficult to ascertain and even more difficult to prove." Musalo, *supra*, at 1202. She elaborates that "[t]he persecutor can neither be put on the stand and questioned as to his motivation nor deposed or required to answer interrogatories" and that "evidence of intent—direct or circumstantial—is exceedingly difficult to obtain." *Id.*

Professor Musalo explains that "[t]he requirement, or lack thereof, of proof of intent in three distinct areas of law, criminal, tort, and statutory civil rights, demonstrates judicial flexibility in the accommodation of jurisprudential objectives." *Id*. at 1229. She notes both that proof of intent in criminal cases has often been modified to protect perceived societal interests, and that tort law has evolved away from proof of negligence toward absolute or strict liability. *Id.* Such considerations are particularly apt in assessing whether it is more likely than not that severe pain and suffering to which a victim will be subjected in the future is specifically intended by government officials.

As Professor Musalo's article makes clear, it has long been accepted that "[t]he victim may not know the exact motivation of his or her persecutor, nor, as the Ninth Circuit remarked, are persecutors 'likely to provide their victims with affidavits attesting to their acts of persecution.'" *Id.* at 1202 (quoting *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1985)). In assessing whether it is more likely than not that the respondent will face torture in a Haitian prison once returned to Haiti, it is necessary to draw inferences. *Matter of S-P-*, 21 I&N Dec. 486, 494 (BIA 1996) (citing *INS v. Elias-Zacarias*, 502 U.S. 478 (1992)). In such circumstances, the potential victim cannot be charged with proving specific intent.

In attempting to undermine the evidence of "deliberateness" on the part of Haitian Government prison authorities, the majority opinion emphasizes the "legitimate national interest" in protecting citizens from increased criminal activity. *Matter of J-E-*, *supra*, at 300. Without more, the majority seems to conclude that categorically detaining any individual convicted of a crime in the United States—whether or not that person has served his or her time, no matter what the crime and whether or not the offender has been rehabilitated or reformed—is acceptable as a lawful sanction. Even if such detention without trial or charges were acceptable under Haiti's laws, conditions of detention that are so egregious that they are more likely than not to inflict severe physical or mental pain and suffering on the respondent violate the Convention Against Torture.

The infliction of torture cannot be excused by virtue of it being a consequence of the imposition of ostensibly "lawful sanctions." "Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, . . . but *do not include sanctions that defeat the object and purpose of the Convention Against Torture . . . .*" 8 C.F.R. § 208.18(a)(3) (emphasis added). The record reflects that Haitian authorities have continued to detain returnees, notwithstanding their awareness of the deplorable conditions and mistreatment in the prisons that amounts to severe pain and suffering. Knowing and deliberate detention under such conditions is sufficient to establish intentionally inflicted torture under the regulations.

## C. Individual Circumstances

Lastly, I emphasize that the determination of eligibility under the Convention relies on a prediction of the likelihood of future torture to which a respondent may be subjected. The regulations are clear that "all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 208.16(c)(3). Such evidence includes, but is not limited to, evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to another part of the country of removal; evidence of gross, flagrant, or mass violations of human rights within the country of removal; and other

relevant information regarding conditions in the country of removal. *Id.*; *see also Kamalthas v. INS*, 251 F.3d 1279, 1282 (9th Cir. 2001); *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000). Although past circumstances may be considered, the determination is a prospective one.

It may be that, as a general rule, prison conditions alone will not meet the definition of torture. However, we must focus on the specific evidence presented in each case rather than relying on blanket conclusions. In this case, the certainty that this respondent will be detained in prison and the evidence of horrific prison conditions in Haiti, combined with the reports of regular beatings by prison guards, exacerbated further by reports of other forms of torture, all committed by Haitian Government officials with impunity, establish that it is more likely than not the respondent will be tortured if returned to Haiti.

## III. CONCLUSION

Accordingly, I dissent from the opinion of the majority. I agree with the opinion of Board Member Schmidt, which concludes that it is more likely than not that the respondent would be tortured upon his return to Haiti and detention in a Haitian jail.