LESLIE H. SOUTHWICK, Circuit Judge:
An immigration judge determined that the petitioner was entitled to deferral of removal under the United Nations Convention Against Torture. The Board of Immigration Appeals reversed, but in doing so it committed legal error by applying the wrong review standard to the factual findings. We GRANT Morales-Morales's petition for review and REMAND for further proceedings.
FACTUAL AND PROCEDURAL HISTORY
Avigail Morales-Morales is a native and citizen of El Salvador. She entered the United States unlawfully in 1989 when she was 12 years old. In 1995, she was convicted of aggravated robbery and sentenced to a six-year prison term. After completing her sentence, she was deported. In 2002, Morales-Morales reentered the United States. She was removed in 2004, only to return later that same year.
In 2015, the Department of Homeland Security reinstated the 2004 removal order. Also that year, Morales-Morales pled guilty to illegal reentry and then served a two-year prison sentence. After completing her sentence, Morales-Morales expressed fear of returning to El Salvador. She was transferred to an asylum officer, who agreed she had a reasonable fear. Her case was then referred to an immigration judge ("IJ") for proceedings concerning only the withholding of removal.
At the hearing before an IJ, Morales-Morales and Dr. Thomas Boerman testified about the petitioner's individual circumstances and the country conditions in El Salvador. Morales-Morales testified that when she came to the United States, she lived in the Los Angeles area. While there, she associated with neighborhood MS-13 gang members. Morales-Morales declared that "one could say [she] became a member [of MS-13] when [she] was 13 years old," evidenced in part by her getting an 'M' tattoo on the middle finger of her right hand. Morales-Morales states *459 she was never formally initiated into the gang, but the friends with whom she associated referred to each other as "part of the MS-13." She primarily performed "lookout" duties for her associates when they would steal car parts.
Morales-Morales moved to Plano, Texas with her mother and siblings in 1992 after her father was deported. Her cousin Daniel also lived in Plano and was attempting to start an MS-13 "clique." Morales-Morales was not involved with MS-13 at the time. However, when Morales-Morales was 17 and still living in Plano, she committed aggravated robbery with an unloaded firearm, for which she served a prison sentence of six years.
After serving her prison term, Morales-Morales was removed to El Salvador where she lived with her grandmother. Her cousin, Daniel, who had also been removed, lived with her. Daniel continued to be involved with MS-13. Her cousins Erick and Jonathan were also MS-13 members, as was her cousin Patricia's husband, Jose.
At the hearing, Morales-Morales detailed some of her involvement with MS-13 in El Salvador. While at a community party, a fight broke out between rival gangs. Daniel handed Morales-Morales his gun to return it to the house, as police had shown up to the party to break up the fight and were searching suspicious individuals for weapons.
Later, Morales-Morales left her grandmother's house to get away from her cousins. She moved to her mother's house. While she lived there, her cousins used that home to hide weapons and were on occasion there in her absence. One night, while Morales-Morales was asleep, rival gang members banged on a gate for the home with machetes and perhaps chains, calling her cousins by name. Morales-Morales escaped on a bike and moved to her godmother's house. Morales-Morales testified that during this time, she believed her cousins thought she was still in MS-13 because of her criminal conviction and her activities in Los Angeles. She testified that she never denied her gang involvement.
After Morales-Morales's second removal in 2004, she returned to El Salvador. She testified that most of the people with whom she previously associated were either dead, in prison, or had left the country. Within a few days of her arrival and even though she had not told anyone she was returning, a man sent by Daniel from prison asked Morales-Morales for money. That person said Daniel wanted her to go see him in order to do "extortion for him." Morales-Morales stated that she would go see Daniel. Within a week of this conversation, Morales-Morales, feeling threatened, returned to the United States, stating she would rather be imprisoned in the United States than be in El Salvador.
While Morales-Morales was back in the United States, her family members suffered gang-related violence and imprisonment. She learned from her mother that in 2006, her cousin Jonathan was killed by one gang for passing information to a rival gang. Morales-Morales also testified she learned from her mother that her cousin's husband Jose was killed by MS-13 upon returning to El Salvador as he was dying from cancer. After his death, his widow worked on Daniel's behalf to obtain money from Daniel's alleged "customers." According to Morales-Morales, Patricia may not have known she was engaging in extortion, but she was prosecuted and served a five-year sentence for it. Patricia thereafter went into hiding. Morales-Morales's nephew Sergio was shot in 2009 because he did not want to join MS-13. Finally, Morales-Morales's cousins orchestrated a drive-by shooting of her grandmother's house, although *460 her grandmother was not living there at the time.
Morales-Morales testified she believes MS-13 views her as a traitor because she does not want to be a part of the gang anymore nor did she comply with any of Daniel's demands, including a 2012 request for money. Morales-Morales also testified that she believes the Salvadoran police are corrupt and are unlikely to protect her. She testified that the police pass information along "to the wrong people" and that they permitted her cousins to break curfew to extort people. She did, however, acknowledge that she would call the police in an emergency.
Additional testimony was given by Dr. Thomas Boerman. He described conditions in El Salvador. Dr. Boerman testified that even though El Salvador is only the size of Massachusetts, it has approximately 60,000 gang members and perhaps 500,000 gang sympathizers. Dr. Boerman testified that MS-13 and Mara 18 (the rival gang) are defined by their brutality and "incomprehensible" violence. The gangs control "every dimension of public life in gang-controlled areas." The gangs operate using "sheer, unabashed terror ... directed towards police, prosecutors, military judges, corrections officials, elected officials and ... members of the public."
To combat this terror, the Salvadoran government criminalized gang membership and enhanced sentences for gang crimes in a policy known as "mano dura," or "heavy hand." In Dr. Boerman's opinion, the strategy was an abject failure; levels of violence and gang sophistication have "increased exponentially." The Salvadoran government "has no capacity to control its problems" and suffers from corruption.
Specific to Morales-Morales, Dr. Boerman testified that women are perceived as property and are forced to participate in criminal activities under "threat of death to themselves, to family members, and children." Women are also commonly raped, tortured, and murdered by gang members. Dr. Boerman testified that if Morales-Morales returned to El Salvador, her MS-13 family members would demand she engage in criminal activity on behalf of the gang. Refusal would result in a risk of "egregious physical harm, sexual violence, and ... a high probability of death." Morales-Morales also faces harm from Mara 18 due to her family's association with MS-13. Dr. Boerman testified that Salvadoran security officials "facilitate the killing by letting the gang members know where the target is or even physically delivering the target to the gang members."
Dr. Boerman stated that the security officials in El Salvador have recently implemented an "extraordinary measures" policy, in which the security forces target perceived gang-collaborators. Part of this strategy includes subjecting collaborators to the same "kinds of abuses" as known gang members, which includes arrests, "extrajudicial killings," and being made to disappear. According to Dr. Boerman, "the Salvadoran government perceives the majority of its gang problem to be facilitated by gang members returning from the U.S. So they're ... hypervigilant about those people coming back from other countries." Dr. Boerman suggests that because Morales-Morales would be perceived as a long-term MS-13 associate, she would be at a high risk to be "disappeared." Dr. Boerman testified that even if the United States did not inform the government that Morales-Morales is classified as an MS-13 member, "the Salvadoran government is going to know anyway" because of the way community life is structured in El Salvador.
The IJ determined based on the testimony and declarations of Morales-Morales and Dr. Boerman "that it is more likely *461 than not that she faces torture in El Salvador by either the Salvadoran government or by individuals or groups who may act with the consent, acquiescence or willful blindness of the Salvadoran government." The IJ determined both Morales-Morales and Dr. Boerman were credible and afforded their evidence "full weight," finding that Morales-Morales met the legal requirements under the Convention Against Torture ("CAT"). Therefore, the IJ deferred her removal.
The government then appealed to the BIA, which reversed in a single-member decision. The BIA held that the IJ's findings that Morales-Morales was "closely associated" with MS-13, that "the Salvadoran police would become aware of [her] gang affiliation," and that the Salvadoran police would torture Morales-Morales were clearly erroneous. The BIA also held that the IJ erred in concluding that Morales-Morales would be tortured by gangs with the consent or acquiescence of public officials. In support of this conclusion, the BIA found that there was no meaningful change in country conditions between 2002 and 2004, and that Morales-Morales's fear was instead related to her cousin. The BIA also rejected Morales-Morales's argument that the appeal should be dismissed because the government failed to sign a proof of service.
Morales-Morales petitioned for review in this court on December 11, 2017. She was removed during the time her petition has been pending in this court. Morales-Morales submitted a pro se brief on February 12, 2018. She argued that the IJ properly deferred removal, that her counsel was ineffective, and that the BIA should have dismissed the government's appeal for lack of a signature on the proof of service. After the government filed its response, in January 2019, the court appointed pro bono counsel for Morales-Morales. The parties then filed supplemental briefs.
We express our appreciation to pro bono counsel for their assistance, both in briefing the case and in presenting oral argument.
DISCUSSION
We first address whether we have jurisdiction over this petition for review. Morales-Morales is an alien removable under 8 U.S.C. § 1227(a)(2)(A)(iii) because of her robbery conviction. Courts do not "have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" an offense under that part of section 1227. § 1252(a)(2)(C). We do retain jurisdiction, though, to review questions of law or constitutional claims. § 1252(a)(2)(D); see also Claudio v. Holder , 601 F.3d 316, 318 (5th Cir. 2010).
Morales-Morales argues that this jurisdictional bar does not apply to deferral-of-removal cases. As we just quoted, the statute refers to a "final order of removal" and an alien's being removable for having committed defined offenses. Morales-Morales argues that the IJ's deferral-of-removal order was not a "final order," and that means the jurisdictional bar does not apply. Wanjiru v. Holder , 705 F.3d 258, 264 (7th Cir. 2013). Morales-Morales also argues that being denied deferral as she was by the BIA is not the same as being found removable "by reason of" having committed an aggravated felony, citing Lemus-Galvan v. Mukasey , 518 F.3d 1081, 1083 (9th Cir. 2008), overruled on other grounds by Maldonado v. Lynch , 786 F.3d 1155, 1164 (9th Cir. 2015) for the proposition that removal on the merits of a CAT claim is not by reason of an aggravated felony.
These arguments are foreclosed by one of our precedents. We have held that *462 Section 1252(a)(2)(C) blocks review of a "challenge to the BIA's denial of [the petitioner's] application for withholding of removal and CAT relief, except to the extent [the petitioner] raises legal or constitutional questions." Iruegas-Valdez v. Yates , 846 F.3d 806, 810 (5th Cir. 2017). We therefore review Morales-Morales's arguments only to the extent she raises legal questions.
We first will address three issues briefed by Morales-Morales pro se that were not discussed by pro bono counsel in Morales-Morales's supplemental brief. Then, we turn to the claim made by pro bono counsel that the BIA committed legal error by not applying the correct legal standard to its review of the IJ's fact-findings. Part of our analysis on each is whether any of the arguments raises questions of law under Section 1252(a)(2)(D).
I. Pro se issues
Morales-Morales claims her earlier counsel was ineffective. Judicial review of a final removal order requires that "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1) ; Roy v. Ashcroft , 389 F.3d 132, 137 (5th Cir. 2004). Because the BIA has established a procedure for handling claims challenging the performance of counsel, Morales must first have presented this claim to the BIA. She did not. See Goonsuwan v. Ashcroft , 252 F.3d 383, 389-90 (5th Cir. 2001). We have no jurisdiction to consider this claim without even needing to reach whether it is properly seen as a legal issue under Section 1252(a)(2)(D).
We also lack jurisdiction to consider Morales-Morales's claim that she would have been released from custody once the IJ granted her relief. Even if this court were the proper place to seek relief from immigration detention, Morales-Morales is no longer detained. See Ochieng v. Mukasey , 520 F.3d 1110, 1115 (10th Cir. 2008) (holding that a court of appeals, in a proceeding under Section 1252, is not the "appropriate forum" in which to bring, in the first instance, a challenge to detention). Because Morales-Morales is no longer detained and has already been deported, her challenge to her detention is moot. See Chay v. Holder , 470 F. App'x 406, 407 (5th Cir. 2012).
Morales-Morales's third pro se claim is that the BIA lacked authority to hear the government's appeal because government counsel failed to sign the proof of service section in the notice of appeal. The government responds that we lack jurisdiction even to consider this claim because it does not raise a colorable constitutional or legal issue.
We first identify the argument. There is some fairly stringent language about proof of service in the regulations governing appeals to the BIA. "The appeal must reflect proof of service of a copy of the appeal and all attachments on the opposing party." 8 C.F.R. § 1003.3(a)(1). The government's attorney signed the notice of appeal but failed to sign the proof of service portion of the notice. During her BIA appeal, Morales-Morales raised the issue. The BIA held that Morales-Morales was "technically correct" but rejected the claim, finding there was no prejudice. To the extent Morales-Morales argues that the BIA failed to enforce administrative rules governing appeals before the BIA, she presents a question of law. See Bokhari v. Holder , 622 F.3d 357, 359 (5th Cir. 2010) (holding that the BIA's "interpretation and application of the relevant regulations and statutes" presents "constitutional claims or questions of law" over which this court has jurisdiction).
The regulation at issue states that a notice of appeal must reflect proof of service of a copy of the appeal and all attachments on the opposing party. An *463 appeal is not properly filed unless it is received at the Board, along with all required documents, fees or fee waiver requests, and proof of service, within the time specified in the governing sections of this chapter.
8 C.F.R. § 1003.3(a)(1). The regulation does not, however, define "proof of service." Instead, the BIA's practice manual requires that "[e]very Proof of Service must be signed by the person serving the document." BOARD OF IMMIGRATION APPEALS PRACTICE MANUAL § 3.2(d). The BIA "rejects any submission" that does not include such information. Id. Nevertheless, the practice manual expressly states that it "does not carry the weight of law or regulation." Id. § 1.1(c). Nor does the manual "extend or limit the jurisdiction of the Board as established by law and regulation." Id.
The BIA, in interpreting the proof of service requirement, has held that failure to submit a proper proof of service is a procedural error and not a jurisdictional bar. Hussein Jama Ibrahim , AXXX-XX7-653, 2018 WL 5921044, at 2 (BIA Sept. 27, 2018). There is no reason to deviate from the BIA's practice. The BIA did not lack jurisdiction to consider the government's appeal.
To the extent that Morales-Morales raises a due process constitutional claim, it fails because she did not show prejudice. See Toscano-Gil v. Trominski , 210 F.3d 470, 473-74 (5th Cir. 2000). Morales-Morales did not argue that she was denied notice of the government's claims or an "opportunity to be heard or present evidence." Id. at 474. To the contrary, Morales-Morales's attorney filed a brief in support of the IJ's decision. No prejudice therefore was shown to constitute a due process violation.
II. Pro bono counsel's issues: BIA legal errors
The pro bono counsel identified several of what they categorized as legal errors by the BIA that would allow our review. We start with the argument that the BIA may have stated the correct legal standard for reviewing fact findings made by the IJ, but it did not then apply that standard.
The BIA stated in its opinion that it reviewed the IJ's findings "under a clearly erroneous standard." BIA regulations prohibit the BIA from engaging in de novo review of the facts. 8 C.F.R. § 1003.1(d)(3)(i). "The BIA may not overturn an IJ's factual findings 'simply because the Board would have weighed the evidence differently or decided the facts differently had it been the factfinder.' " Alvarado de Rodriguez v. Holder , 585 F.3d 227, 234 (5th Cir. 2009) (citation omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 234-35 (citation omitted).
Morales-Morales argues that the BIA erred because although it "gave lip service to the clear-error standard," it did not apply it. Our first needed analysis, then, is whether such a claim is properly viewed as one based on legal error. It is. We have held that "the BIA is not entitled to state the correct legal standard but actually apply an incorrect standard." Id. at 235. Therefore, even though the BIA stated it applied the clearly erroneous standard, we can review its decision to determine whether it actually applied that standard or instead applied an improper one. Id. (citing Chen v. Bureau of Citizenship & Immigration Servs. , 470 F.3d 509, 514-15 (2d. Cir. 2006) ). If the wrong standard was applied, our practice is to remand so that the BIA can apply the correct standard. Id .
*464 A. Convention Against Torture - overview
The central question presented to the IJ and then the BIA was whether Morales-Morales was entitled to relief under the CAT. The CAT protects noncitizens from removal to countries where they will likely face torture. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, opened for signature Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, 114. Morales-Morales, who was held to be removable due to a criminal conviction, argues she was entitled to a deferral of removal. 8 C.F.R. § 1208.17(a). Morales-Morales demonstrated to an immigration officer a reasonable fear of torture, which meant her case was referred to an IJ. 8 C.F.R. § 1208.31.
Torture is "severe pain or suffering, whether physical or mental," that is "intentionally inflicted" to "intimidat[e] or coerc[e]" an individual "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). Morales-Morales had to show "that it is more likely than not that ... she would be tortured" upon return to El Salvador and that the state either directly inflicts the torture, or relevant here, at least acquiesces in it. Iruegas-Valdez , 846 F.3d at 812. The IJ found she had made the required showing. The BIA reversed. Morales-Morales seeks relief here.
Morales-Morales argues the IJ correctly found she was likely to be tortured by gangs with the consent or acquiescence of Salvadoran officials and that she was likely to be tortured by Salvadoran officials. We first review whether the BIA legally erred when it found that Morales-Morales was not likely to be tortured by gangs with the consent and acquiescence of Salvadoran officials. We then review whether the BIA erred when it found that three of the IJ's fact findings undergirding the ultimate finding that Morales-Morales would likely be tortured by Salvadoran officials themselves were clearly erroneous: "(1) the applicant is 'closely associated' with MS-13; (2) the Salvadoran police would become aware of the applicant's gang affiliation; and (3) the Salvadoran police would - more likely than not - torture the applicant."
B. Acquiescence by Salvadoran officials to torture by gangs
Morales-Morales and the government agree that the BIA legally erred when it reversed the IJ's finding that it is more likely than not that Morales-Morales would be tortured in El Salvador with the acquiescence of the Salvadoran government. The BIA was required to review the IJ's findings that Morales-Morales would likely be tortured in the future by gang members under the clear error standard. See Matter of Z-Z-O- , 26 I & N Dec. 586, 590 (BIA 2015). The BIA relied principally on two facts in concluding that the IJ's prediction was erroneous: there was not a meaningful change in country conditions between 2002 and 2004, and if Morales-Morales's "brief interaction in 2004 with the gang messenger dispatched by her cousin is subtracted from the claim, then the claim consists of little more than generalized country conditions."
Morales-Morales argues, and the government agrees, that the BIA impermissibly relied on country conditions in 2004. That was error because "the ultimate question [under the CAT] was whether Morales-Morales presently faced a likelihood of torture in El Salvador."[1] While the *465 regulations implementing the CAT state that "[e]vidence of past torture inflicted upon the applicant" and "other relevant information regarding conditions in the country of removal" shall be considered, the regulations also mandate that "all evidence relevant to the possibility of future torture shall be considered." 8 C.F.R. § 1208.16(c)(3) (emphasis added). The IJ determined that were Morales-Morales to return "now , the family members will once again demand she engage in criminal behavior, but if she refuses, she will be subjected to harm and death. Dr. Boerman said that if you demonstrate disloyalty to your gang, you can be killed." (emphasis added). Furthermore, the IJ relied on Dr. Boerman's testimony that El Salvador is now in "literally a state of war." Morales-Morales reported multiple murders of her family members which she attributed to gang violence that occurred after 2004. The BIA's focus on whether country conditions were different between 2002 and 2004 ignores significant record evidence relied upon by the IJ in determining that Morales-Morales faced likely torture from gang members in El Salvador in 2016. This constitutes de novo review and is legal error by the BIA. See Alvarado de Rodriguez , 585 F.3d at 235.
As to the BIA's finding that if Morales-Morales's visit from the messenger sent by Daniel were "subtracted," i.e ., ignored, her claim rests on "little more than evidence of generalized country conditions," the BIA did not explain how the evidence could be "subtracted." The IJ relied in significant part on the messenger sent by Daniel in determining that Morales-Morales would possibly face torture from MS-13 for her failure to comply with his demands. The BIA's decision to ignore evidence that was relied upon by the IJ, and that the BIA itself found credible, constitutes de novo review and therefore legal error. We also conclude the BIA's decision to "subtract" the evidence was legal error because the regulations explicitly require consideration of "all evidence relevant to the possibility of future torture." 8 C.F.R. § 1208.16(c)(3).
The BIA otherwise failed to explain why the numerous factual findings by the IJ were insufficient to show that Morales-Morales was likely to be tortured by gangs in El Salvador with the acquiescence of Salvadoran officials.[2] The IJ cited, among other things, evidence that Morales-Morales's family members were murdered by gang violence, that Daniel and Erick operate within MS-13 and have made demands on Morales-Morales, that Morales-Morales refused to comply with Daniel's demands, that gangs engage in "horrific acts of terror and violence," and that family members are not immune to those acts. The BIA's failure to consider whether this evidence, explicitly cited by the IJ, established that Morales-Morales was more likely than not to be tortured by gang members with the consent or acquiescence of government officials constitutes legal "error regarding what [Morales-Morales] was required to show to obtain CAT protection." Iruegas-Valdez , 846 F.3d at 813 (citation omitted).
C. Torture by Salvadoran officials
Morales-Morales argues that the "BIA misapplied clear-error review when it overturned the factual findings underpinning the IJ's" factual findings that led to its conclusion that Morales-Morales is likely to be tortured by Salvadoran officials. These findings are "that (1) Morales-Morales is closely associated with MS-13; (2)
*466 the Salvadoran government would become aware of that association; and (3) Salvadoran officials would likely torture her as a result." The government argues that the IJ's factual findings were clearly erroneous because Morales-Morales's gang membership ended 25 years ago, she did not fear returning to El Salvador on her previous removals, and she was not targeted by police when previously removed.
If there "are two permissible views of the evidence," the BIA cannot conclude the IJ erred if it adopted one of those permissible views. Alvarado de Rodriguez , 585 F.3d at 234-35.
1. Close association with MS-13
As to the BIA's first point of error, whether Morales-Morales was closely associated with MS-13, the BIA erred by re-weighing the evidence. Morales-Morales provided evidence that she is a close family member to multiple MS-13 members, that she never denied being in MS-13 and was at one time in MS-13, and that she lived in a location that co-housed MS-13 members. The IJ specifically relied on Morales-Morales's former membership and on her family ties. The IJ also relied on Dr. Boerman's testimony that it is immaterial whether Morales-Morales was a "junior member" of the gang because the distinction was immaterial to Salvadoran officials. This evidence is sufficient for a reasonable factfinder to conclude Morales-Morales is "closely associated" with MS-13. It was error for the BIA to substitute its own judgment on de novo review.
2. Salvadoran officials' awareness of gang affiliation
On the BIA's second point of error, record evidence supports that Salvadoran officials would become aware of Morales-Morales's MS-13 association. Dr. Boerman testified that Morales-Morales would be identified as a gang member or associate, and that Salvadoran officials would easily discover the information. The BIA and the government both claim that the IJ's reliance on a DHS removal operations and procedure manual was improper, and that no other evidence supports that Salvadoran officials would become aware of Morales-Morales's gang affiliation. That is incorrect. The IJ's opinion, in a section discussing Dr. Boerman's testimony, explicitly noted that if Morales-Morales were repatriated, the customs processing would identify her as a gang member. This finding was based on record evidence, and independently supports the IJ's finding that Salvadoran officials would be aware of Morales-Morales's gang affiliation.
The government in turn argues that on multiple prior relocations to El Salvador, Morales-Morales was not tortured or identified as a gang member, thereby undercutting the IJ's finding that Morales-Morales's affiliation would be disclosed under this deportation. However, as noted above, Dr. Boerman testified that country conditions changed between 2004 and 2016. In 2016, the "extraordinary measures" policy was put in place, which includes targeting gang apologists and collaborators. This suggests that the change in Salvadoran policy explains why Morales-Morales's previous deportations are not representative of what would happen in the future.
The BIA, therefore, in applying the regulations and considering all record evidence supporting the possibility of future torture under a clear error standard, could not have overturned the IJ's factual findings. See 8 C.F.R. § 1208.16(c)(3). Regardless of whose findings are the more reasonable, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."
*467 Anderson v. City of Bessemer City , 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). It was reasonable for the IJ to conclude that, based on the testimony of Dr. Boerman, country conditions have changed since 2004 and Morales-Morales's gang affiliation would be discovered by Salvadoran officials. The BIA therefore legally erred because it applied de novo review to substitute its own findings.
3. Ultimate finding of likely torture by Salvadoran officials
Finally, Morales-Morales argues that the BIA legally erred by finding the IJ's "ultimate predictive factual finding" that she would be tortured by Salvadoran officials was clearly erroneous. After finding that Morales-Morales's gang membership would not be disclosed to Salvadoran officials and that she was not closely associated with MS-13, the BIA stated that Morales-Morales's claim "boil[ed] down to her interaction with the gang messenger dispatched by her cousin from prison." The BIA found that this interaction did not support that Salvadoran officials would torture Morales-Morales.
The government, in support of the BIA's decision, argues that Morales-Morales did not fear the police when returning to El Salvador on prior removals, and that there was no evidence that Morales-Morales was targeted by Salvadoran police on her prior removals. The government claims that these facts sufficiently undercut the IJ's finding of likely torture by Salvadoran officials. As already discussed, though, Dr. Boerman specifically testified about the new "extraordinary measures" the Salvadoran government was taking to combat the gang problem and the IJ specifically relied on that fact in finding that Morales-Morales was likely to be tortured by Salvadoran officials. As to Morales-Morales's lack of fear, the CAT regulation does not include subjective fear as a mandatory consideration. 8 C.F.R. § 1208.16(c)(3). The IJ shall consider "all evidence relevant to the possibility of future torture." Id.
The evidence relevant to Morales-Morales's close gang association and its likely disclosure to Salvadoran officials is the following. Dr. Boerman's testimony sufficiently covers the IJ's finding that "[t]he extraordinary measures that are currently in place in El Salvador[,] which target both gang members and collaborators, place Ms. Morales in the direct crosshairs of the Salvadoran police, as she is not only the family member of ranking MS-13 members, but she is also a veteran MS-13 gang member (junior or otherwise)." The IJ found based on Dr. Boerman's testimony "that there is near complete impunity for the murder, torture, and harm of gang members and their affiliates by the police." Sufficient evidence was before the IJ to find that, if police knew that Morales-Morales was somehow closely associated with MS-13, either through her perceived "veteran" status or her perceived collaborator status, she could be a target for murder by Salvadoran police.
Because the IJ's finding was one permissible view of the evidence, the BIA erred in imposing its own view on de novo review.
Having found the BIA legally erred in its review of the IJ's fact-findings, we follow our usual course and remand for the BIA to apply the proper review standard to the IJ's ruling. See Alvarado de Rodriguez , 585 F.3d at 235. We express no view on the ultimate outcome or on what actions the BIA should take on remand.
We GRANT Morales-Morales's petition for review and REMAND.

The government agrees that the BIA's focus on 2002 to 2004 is irrelevant for Morales-Morales's CAT claim.

The BIA did not even address Salvadoran officials' likelihood of "turn[ing] a blind eye to any harm [Morales-Morales] may face."