# Matter of A-A-R-, Applicant

*Decided as amended April 24, 2025[1]*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

Based on the facts and evidence in this case, the applicant, a former MS-13 gang member, has not met his burden to show he will more likely than not be tortured in El Salvador based on the government's state of exception policy.

FOR THE APPLICANT: Liora A. Cohen-Fraade, Esquire, Brooklyn, New York

FOR THE DEPARTMENT OF HOMELAND SECURITY: Julie A. Werdt, Assistant Chief Counsel

BEFORE: Board Panel: MALPHRUS, Chief Appellate Immigration Judge; MULLANE and GOODWIN, Appellate Immigration Judges.

MALPHRUS, Chief Appellate Immigration Judge:

On September 26, 2024, the Immigration Judge granted the applicant deferral of removal under the regulations implementing the Convention Against Torture ("CAT").[2] The Department of Homeland Security ("DHS") has appealed that decision. Because the record does not support a grant of protection under the CAT, the appeal will be sustained.

The applicant is a native and citizen of El Salvador, who entered the United States for the first time without inspection in 1999. He joined the MS-13 gang while residing in the United States. In 2006, he was convicted of murder in the United States District Court for the Western District of North Carolina. After completing his sentence for murder, he was removed to El Salvador in 2021. He illegally reentered the United States in 2022. DHS reinstated the prior removal order and on March 18, 2024, issued a Form I-863, Notice of Referral to Immigration Judge, initiating the applicant's withholding only proceedings. He applied for deferral of removal under the CAT, which the Immigration Judge granted. DHS appealed.

---

[1]  We amend the April 22, 2025, order in this case to make technical corrections.

[2]  The Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994).

Under the jurisdiction of the United States Court of Appeals for the Third Circuit, when evaluating a claim for protection under the CAT, an Immigration Judge must examine: (1) what is likely to happen to the applicant if he is removed, and (2) whether what is likely to happen amounts to the legal definition of torture. *Myrie v. Att'y Gen. U.S.*, 855 F.3d 509, 516 (3d Cir. 2017). The question of what will happen to an applicant is a factual finding the Board reviews for clear error. *See id.* Whether such harm amounts to torture is a legal determination that we review de novo. *Id.*; *see also Matter of R-A-F-*, 27 I&N Dec. 778, 779–80 (A.G. 2020).

The applicant seeks protection from removal, arguing that he will be detained, imprisoned, and tortured in El Salvador because of the government's state of exception policy and its treatment of gang members. The record evidence shows the Salvadoran Government announced a "state of exception" or "state of emergency" in March 2022 following an increase in gang-related homicide, including the murder of 87 people in one weekend (Exh. 9, Tab L at 73, Tab O, Tab DD at 295, Tab JJ at 338, Tab RR at 469, 476, 497). Under the state of exception, which must be renewed monthly, security forces are empowered to arrest anyone suspected of belonging to a gang or providing support to gangs (Exh. 9, Tab L at 73, Tab M at 121, Tab O, Tab W at 244, Tab X at 252).

The Immigration Judge found that if the applicant is removed, he will be detained upon his arrival in El Salvador pursuant to the state of exception policy because he will be identified as a former gang member deported from the United States who has numerous gang-related tattoos and a criminal history. We discern no clear error in this predictive finding. *See Matter of Z-Z-O-*, 26 I&N Dec. 586, 590 (BIA 2015) (explaining that an Immigration Judge's predictive findings of what may or may not occur in the future are findings of fact, which are subject to a clearly erroneous standard of review). It is undisputed that the applicant either is or was a member of the MS-13 gang[3] and that he has several tattoos related to his gang membership, including "MS" tattooed on the back of his head with three letters representing his gang clique and Mara Salvatrucha tattoos on his arms and chest. The record establishes that the applicant has a serious criminal history in the United States, and that information about his criminal history and gang affiliation would likely be shared with the Salvadoran Government through the Criminal History Information Sharing Program between the United States and El Salvador (Exh. 9, Tab L at 97, Tab P at 160–66, Tab Q at 184–86).

---

[3] Although DHS submitted evidence it argued showed that the applicant is an active member of the MS-13, the applicant testified that he is no longer a member of the gang. The Immigration Judge found the applicant credible.

Further, the record evidence establishes a history of widespread detention of prior and suspected gang members in El Salvador (Exh. 9, Tab M at 116).

Although there is no clear error in the Immigration Judge's finding that the applicant will likely be identified as a former gang member and detained in El Salvador, we disagree with the Immigration Judge that the applicant has satisfied his burden of proving that it is more likely than not that he will be tortured in detention by, at the instigation of, or with the consent or acquiescence of a public official. *See* 8 C.F.R. § 1208.16(c)(2) (2025); 8 C.F.R. § 1208.18(a)(1) (2020); *see also Matter of R-A-F-*, 27 I&N Dec. at 779 (emphasizing that the Board reviews de novo the ultimate question of whether the alien's predicted harm satisfies the legal definition of torture).

There are significant similarities between this case and the Board's decision in *Matter of J-E-*, 23 I&N Dec. 291 (BIA 2002). In *Matter of J-E-*, 23 I&N Dec. at 293, 299–300, the Haitian Government had a policy of incarcerating criminal deportees to deter criminal activity in Haiti. We concluded there that the Haitian Government had "a legitimate national interest in protecting its citizens from increased criminal activity," and that Haitian authorities did not "use torture as a matter of policy." *Id*. at 300, 303. The Salvadoran Government's policy of incarcerating suspected gang members as a method of addressing historic violence in the country is similar to the policy in *Matter of J-E-* (Exh. 9, Tab RR at 469, 476, 497). And like in *Matter of J-E-*, the state of exception policy "in itself appears to be a lawful enforcement sanction designed . . . to protect the populace from criminal acts" committed by gang members. *Id.* at 300; *see also* 8 C.F.R. § 1208.18(a)(3) (stating that torture does not include harm that is lawfully sanctioned).

## I. LEGAL STANDARD FOR TORTURE

After finding that the applicant will more likely than not be detained, the Immigration Judge found that he "will more likely than not be tortured in detention by law enforcement, who are purposely inflicting severe harm on the detainees" (IJ at 9). This conclusory statement was not accompanied by any factual findings regarding the applicant's predicted experiences after he is detained, such as where he is likely to be detained, whether he is likely to be detained indefinitely or detained initially and later released, and what type of mistreatment he is likely to experience while detained. *See Matter of J-F-F-*, 23 I&N Dec. 912, 917–18, 918 n.4 (BIA 2006) (emphasizing that the Immigration Judge must identify every step in the hypothetical chain of events that will lead to the alien's torture and that every link must be more likely than not to occur); *see also Myrie*, 855 F.3d at 516. Rather, the

Immigration Judge relied on an expert witness' report and reports from nongovernmental organizations, including Amnesty International and Human Rights Watch, that state some detainees and suspected gang members have been subjected to mistreatment and physical abuse rising to the level of torture. Based on this anecdotal evidence, she concluded, without further analysis of the applicant's specific circumstances, that he will more likely than not be tortured by a public official.

This conclusion conflates factual findings regarding the type of mistreatment the applicant could suffer in detention and how likely such mistreatment would be to occur with the legal determination that he has satisfied his burden of proving that such mistreatment would constitute torture. *See Myrie*, 855 F.3d at 516; *see also Arreaga Bravo v. Att'y Gen. U.S.*, 27 F.4th 182, 186 (3d Cir. 2022) (acknowledging that an Immigration Judge's determination that a specific event is more likely than not to occur is a factual finding). Although we evaluate predictive findings of what events will occur for clear error, a determination that the respondent is more likely than not to be tortured requires an evaluation of whether the respondent has satisfied his burden of proof and is "a mixed question of law and fact." *See Arreaga Bravo*, 27 I&N Dec. at 186 (quoting *Myrie*, 855 F.3d at 516). In other words, "whether a predicted factual outcome meets the definition of 'torture' is a question of law that the Board properly considers *de novo*." *Yar v. Garland*, 94 F.4th 1077, 1078 (8th Cir. 2024). Here, the Immigration Judge's predictive findings are intertwined with the ultimate legal determination that the applicant warrants protection under the CAT. If we do not evaluate whether the record evidence supports the Immigration Judge's predictive finding that the applicant will suffer torture, the factual question would subsume the legal one. Our de novo review of the legal burden of proof helps advance the goal that similar cases be decided in a similar manner. *See Matter of H-L-H- & Z-Y-Z-*, 25 I&N Dec. 209, 213 (BIA 2010) ("This review authority also promotes consistency in the application of legal standards so that cases with similar facts are generally decided in a like manner."), *rev'd on other grounds by Hui Lin Huang v. Holder*, 677 F.3d 130 (2d Cir. 2012).

## II. TORTURE BY A PUBLIC OFFICIAL

To the extent the Immigration Judge found that it is more likely than not that the applicant will suffer severe physical abuse at the hands of a government official while in detention, this finding is not adequately supported by the record. The anecdotal reports of some instances of people having been severely harmed or killed in detention in El Salvador, while deplorable, are not sufficient to show that it is more likely than not that this

applicant, in particular, is likely to suffer harm rising to that level (Exh. 9, Tab L at 81, Tab M at 120, Tab T at 215, Tab FF).  *See Matter of J-R-G-P-*, 27 I&N Dec. 482, 486 (BIA 2018) ("[A]lthough the record indicates that some detainees and prisoners in Mexico have experienced physical abuse at the hands of officials, it is the respondent's burden to show that it is more likely than not that *he* will be subjected to this abuse and that this harm will rise to the level of torture.").  "[S]pecific grounds must exist that indicate the [applicant] would be personally at risk."  *Lasu v. Barr*, 970 F.3d 960, 966 (8th Cir. 2020) (quoting *Ademo v. Lynch*, 795 F.3d 823, 831 (8th Cir. 2015)); *see also Benedicto v. Garland*, 12 F.4th 1049, 1064–65 (9th Cir. 2021) (upholding a denial of CAT protection where although there was evidence that police injure detainees, the record did not demonstrate that any individual detainee is more likely than not to be tortured).

According to the expert witness' report and the 2023 Department of State Human Rights Report, over 70,000 Salvadorans have been imprisoned pursuant to the state of exception (Exh. 9, Tab L at 69, Tab M at 121). Widespread imprisonment of actual or suspected gang members, however, is not evidence of widespread torture.  Although the country conditions evidence reflects that hundreds of prisoners have died, that a substantial number showed signs of physical violence, and that there have been reports of severe physical violence committed by prison officials, the applicant must do more than show that some individuals in detention suffer harm rising to the level of torture (Exh. 9, Tab M at 121-22, Tab N at 147, Tab T at 215, Tab FF at 307).

The applicant has not meaningfully explained why he, an over 40-year-old deportee whose gang activity occurred while in the United States, would be similarly situated to those who have been the victim of severe physical violence by prison officials, such that he established the requisite likelihood of future torture. *See Sevoian v. Ashcroft*, 290 F.3d 166, 176 (3d Cir. 2002) (holding that anecdotal evidence that political prisoners have suffered harm constituting torture does not establish that a specific alien will be tortured in prison).  The evidence the Immigration Judge relied upon does not evaluate whether there are characteristics or circumstances that make certain classes of detainees, such as deportees from the United States, any more or less likely to be victims of torture.  Further, the applicant has not shown that the majority of current or former gang members detained in El Salvador are likely to suffer harm satisfying the legal definition of torture, such that he would need to show nothing more than gang affiliation and a likelihood of detention to meet his burden of proof.

We recognize, as the Immigration Judge found, that prison conditions are dangerous and unsanitary, and that there is severe overcrowding and a lack of food (Exh. 9, Tab L at 70, Tab M at 121, Tab T at 217, Tab QQ at 446–49, Tab WW at 537–38). However, these conditions are substantially similar to the "abusive or squalid conditions" the Board addressed in *Matter of J-R-G-P-*, 27 I&N Dec. at 485. As we held in that case, dire conditions in prison or detention facilities do not amount to torture as a matter of law unless there is a "specific intent to cause severe pain and suffering." *Matter of J-R-G-P-*, 27 I&N Dec. at 485; *see also Matter of R-A-F-*, 27 I&N Dec. at 780; 8 C.F.R. § 1208.18(a)(5). "'[T]orture' does not cover 'negligent acts' or harm stemming from a lack of resources." *Matter of J-R-G-P-*, 27 I&N Dec. at 484 (quoting *Matter of J-E-*, 23 I&N Dec. at 299, 231). Likewise, in *Matter of J-E-*, 23 I&N Dec. at 301, we concluded that intentional detention in substandard facilities does not constitute torture unless the evidence demonstrates that poor or life-threatening prison conditions are "intentionally and deliberately create[ed] and maintain[ed]" by authorities to intentionally inflict severe pain or suffering.

The record does not support the Immigration Judge's determination that Salvadoran officials are "intentionally and deliberately creating and maintaining [harsh] prison conditions" for the specific purpose of inflicting severe pain or suffering. *Matter of J-R-G-P-*, 27 I&N Dec. at 484 (emphasis omitted) (quoting *Matter of J-E-*, 23 I&N Dec. at 301). Specific intent for purposes of CAT protection requires "a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act." *Pierre v. Att'y Gen. of U.S.*, 528 F.3d 180, 189 (3d Cir. 2008) (quoting *Auguste v. Ridge*, 395 F.3d 123, 145–46 (3d Cir. 2005)). "Mere knowledge that a result is substantially certain to follow from one's actions is not sufficient to form the specific intent to torture." *Id.* Although "[k]nowledge that pain and suffering will be the certain outcome of conduct may be sufficient for a finding of general intent[,] . . . [it] is not enough for a finding of specific intent." *Id.*

We recognize, as the Immigration Judge noted, that certain public officials have made public comments suggesting that they believe gang members deserve the dangerous and unsanitary conditions they experience in Salvadoran prisons (Exh. 9, Tab L at 70, Tab X at 250). However, the Immigration Judge's inference from these statements that the conditions are created and maintained to torture the inmates is based on an assumption and is not "reasonably grounded in the record as a whole." *Chen v. Gonzales*, 434 F.3d 212, 216 (3d Cir. 2005) (quoting *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998)). The Immigration Judge's finding relied on the expert witness' report, which in turn cited to the United States

Department of State's 2022 Human Rights Report on El Salvador and a 2023 Amnesty International report, stating that Salvadoran public officials advertised on social media that the very poor prison conditions are what the gang members deserve (Exh. 9, Tab L at 70).

This evidence reflects the public officials' moral judgment about gang members. The correlation between public officials' disdain for gang members and the harsh prison conditions, however, does not necessarily indicate intent. We should not simply assume that elected officials have a specific intent to torture based solely on disparaging comments about gang members. For example, it is not clear that the Immigration Judge considered whether such statements advertising the dire conditions may be intended to serve political purposes and garner public support, as well as to deter individuals in the community from engaging in gang activity.

Moreover, in making this inference based on public statements, the Immigration Judge did not engage with other evidence in the record showing the Salvadoran Government's efforts to improve the prison conditions.[4] In this regard, the Immigration Judge's decision does not reflect that she fully evaluated the Department of State country report (Exh. 6; Exh. 9, Tab M). We have previously explained that these reports "are highly probative evidence and are usually the best source of information on conditions in foreign nations." *Matter of H-L-H- & Z-Y-Z-*, 25 I&N Dec. at 213; *see also Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir. 1995) (giving strong evidentiary weight to the Department of State country report, describing it as "the most appropriate and perhaps the best resource" on country conditions (citation omitted)). In evaluating whether an alien has established his or her burden of proof for CAT protection, the Immigration Judge has a duty to meaningfully examine the United States Government reports on country conditions, especially the Department of State country report.

Here, the Department of State country report states that although the Salvadoran Government is aware of the harsh prison conditions, it is taking "credible steps to . . . punish officials who may have committed human rights abuses" (Exh. 6 at 54). While the record evidence contains some reports of mistreatment and physical abuse of detainees by prison guards, an investigation by the Salvadoran attorney general reported that the prison deaths during the state of exception resulted primarily from pre-existing medical conditions or illnesses (Exh. 6 at 55; Exh. 9, Tab M at 118). Additionally, the country report states that while impunity was a problem

---

[4] Advertising the poor conditions as a deterrent to criminal conduct is not inconsistent with attempts to improve those conditions as they currently exist.

within the General Directorate of Penal Centers, particularly for prison guards, some security forces faced criminal trials and were convicted for misconduct related to the state of exception (Exh. 6 at 59–60; Exh. 9, Tab M at 120–21).

Even though the Salvadoran prison system continues to struggle with humanitarian concerns under the state of exception, the record evidence reports that prior to the state of exception, the government had made improvements in hygienic conditions, opportunities for the prisoners to participate in workshops and rehabilitation programs, and even a reduction in overcrowding (Exh. 9, Tab QQ at 486–91). Moreover, although an influx of additional detainees as a result of the state of exception has worsened conditions (Exh. 9, Tab QQ at 446, Tab WW at 538), the Department of State country report indicates that the Salvadoran Government has opened a new prison and begun to move detainees out of overcrowded facilities into this facility (Exh. 6 at 60). Additionally, according to the Human Rights Watch Report in the record, some prisons have better conditions than others (Exh. 9, Tab QQ at 448, 450–52).

We recognize that the Salvadoran Government needs to further address the issue of prison conditions, but the evidence regarding the steps they have taken refutes the applicant's contention that the Salvadoran Government specifically intends the prison conditions as a means to inflict torture. The Immigration Judge simply adopted the expert witness' written report verbatim and did not engage with any of this contrary evidence. Rather, she inferred an intent to cause harm amounting to torture from vague commentary from public officials reflecting a moral judgment of gang members and isolated incidents of torture that are not specific to the applicant's circumstances. The Immigration Judge's factual finding with respect to motive is not adequately supported and is clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) ("[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (citation omitted)).

## III. TORTURE BY PRIVATE ACTOR

The Immigration Judge also stated without elaboration that the applicant would likely be tortured by MS-13 members and that public officials would "not do anything to help" him (IJ at 10). This finding alone is insufficient to support a grant of CAT protection. The Immigration Judge did not make factual findings to support her conclusion that the applicant would likely be tortured by members of his former gang.

Moreover, the Third Circuit has emphasized that in assessing whether an applicant has established that a public official will acquiesce to his feared torture by nonstate actors, the Immigration Judge must "make[] a factual finding or findings as to how public officials will likely act in response to the harm the petitioner fears . . . [and] assess whether the likely response from public officials qualifies as acquiescence under the government regulations." *Myrie*, 855 F.3d at 516. The Immigration Judge did not provide any explanation for her finding that the prison officials would not do anything to help the applicant. She appears to have based this determination on her earlier finding that public officials intend torture because of the commentary made by senior government officials. A grant of CAT protection, however, must be based on more than "unsupported speculation as to how . . . prison officials may potentially react" to harm committed against the applicant by other gang members. *Denis v. Att'y Gen. of U.S.*, 633 F.3d 201, 218 (3d Cir. 2011).

Additionally, the Immigration Judge did not analyze whether the public officials' predicted reaction to the applicant's feared harm by gang members would satisfy the legal definition of acquiescence. As we recently explained, "[a]cquiescence in the CAT context requires a greater degree of governmental complicity than is required to establish a government is unable or unwilling to protect a respondent in the asylum context." *Matter of O-A-R-G-*, 29 I&N Dec. 30, 36 (BIA 2025). It is not sufficient for acquiescence to simply state that government officials would not help the applicant. The Immigration Judge did not provide the specific factual findings that would be needed to support the conclusion that "a public official, prior to the activity constituting torture, [would] have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); *see also Herrow v. Att'y Gen. U.S.*, 93 F.4th 107, 116 (3d Cir. 2024) ("An individual can establish acquiescence by showing that a public official was actually aware of torture or willfully blind to the torture."). While circumstantial evidence that public officials are willfully blind to harm occurring in prison may in some cases establish that a public official will acquiesce to torture, the Immigration Judge's findings in this case do not support such a conclusion. *See Myrie*, 855 F.3d 517–18.

While the possibility of torture requires serious consideration consistent with our treaty obligations, the requirements for a grant of protection under the CAT are exacting. *See Matter of J-F-F-*, 23 I&N Dec. at 917–18, 920–21. Based on the facts and evidence in this case, the applicant, a former MS-13 gang member, has not met his burden to show he will more likely than not be tortured in El Salvador based on the government's state of exception

policy. We emphasize that individual factual circumstances differ and that the country conditions may change. Thus, the merits of any individual claim must be considered on a case-by-case basis. Our determination in this case does not preclude a similarly situated alien from submitting sufficient evidence to support his or her burden of proof for CAT protection. *See* 8 C.F.R. § 1208.16(c)(2)–(3). However, in this case the record does not support the Immigration Judge's ultimate legal determination that the applicant is more likely than not to be tortured in El Salvador with the requisite state action. DHS' appeal will be sustained and the Immigration Judge's decision vacated. The applicant will be removed pursuant to the prior removal order.

**ORDER:** DHS' appeal is sustained.

**FURTHER ORDER:** The Immigration Judge's order dated September 26, 2024, granting protection under the CAT is vacated.

**NOTICE:** If an applicant is subject to a final order of removal and willfully fails or refuses to depart from the United States pursuant to the order, to make timely application in good faith for travel or other documents necessary to depart the United States, or to present himself or herself at the time and place required for removal by DHS, or conspires to or takes any action designed to prevent or hamper the applicant's departure pursuant to the order of removal, the applicant shall be subject to a civil monetary penalty of up to $998 for each day the applicant is in violation. *See* section 274D of the Immigration and Nationality Act, 8 U.S.C. § 1324d (2018); 8 C.F.R. § 280.53(b)(14) (2025).