# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 14, 2026

Lyle W. Cayce
Clerk

———————

No. 24-60592

———————

Jose Fuentes-Pineda,

*Petitioner*,

*versus*

Pamela Bondi, *U.S. Attorney General*,

*Respondent*.

———————————————————

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. A241 005 925

———————————————————

Before Clement, Graves, and Ho, *Circuit Judges*.

James C. Ho, *Circuit Judge*:

The petition for panel rehearing is denied. We withdraw the court's prior opinion of January 14, 2026, and substitute the following opinion.

\* \* \*

Jose Fuentes-Pineda is a native and citizen of El Salvador, where he was a gang member and convicted of murder. He seeks review of a Board of Immigration Appeals (BIA) order denying him deferral of removal under the Convention Against Torture.

No. 24-60592

We uphold the BIA's order for two reasons. First, substantial evidence supports the BIA's conclusion that El Salvador's harsh prison conditions are not specifically intended by the government to inflict torture. And although Salvadoran police officers previously tortured Fuentes-Pineda on two occasions, the BIA justifiably determined his future risk of torture is only speculative. Accordingly, we deny the petition.

## I.

Fuentes-Pineda is a Salvadoran national and a former member of the Barrio 18 or "18th Street" gang—a rival gang of MS-13. He admits he unlawfully entered the United States in 2022 but requests deferral of removal under the Convention Against Torture (CAT).

Fuentes-Pineda was the sole witness at his immigration hearing. He testified that he was forced to join the 18th Street gang as a teenager. As part of his gang initiation, "eighteen" was tattooed on his back and the number 18 was tattooed on his chest. Fuentes-Pineda says he was later allowed to leave the gang because he became a Christian.

The Immigration Judge (IJ) found Fuentes-Pineda's testimony to be generally credible but concluded he could not show a clear probability of future torture by Salvadoran authorities. The IJ's opinion found "[t]he government is aware of his [gang] membership and has targeted him in the past." It described Fuentes-Pineda's conviction "for a gang related homicide" and detailed Fuentes-Pineda's "numerous encounters with the police in El Salvador."

But although "Salvadoran security forces" tortured Fuentes-Pineda on two occasions, "[t]he majority of this mistreatment did not cause" torture, in the IJ's view. The IJ noted "evidence of past torture is only one factor for the Court to consider." It was "too speculative" that the "same officers who tortured" Fuentes-Pineda in the past would participate "in his

No. 24-60592

future arrest and detention." Further, the IJ concluded that poor conditions in Salvadoran prisons are not specifically intended to inflict torture. Fuentes-Pineda therefore could not show a clear probability of future torture. After remanding for further proceedings, the BIA adopted and affirmed the IJ's opinion.[1]

## II.

We typically review only the BIA's decision. But where, as here, the BIA adopted the IJ's opinion, we review the underlying IJ decision as well. *See*, *e.g.*, *Gjetani v. Barr*, 968 F.3d 393, 396 (5th Cir. 2020). And while questions of law are reviewed de novo, factual findings are reviewed only for substantial evidence. *See*, *e.g.*, *Morales v. Garland*, 27 F.4th 370, 371–72 (5th Cir. 2022).

Under the substantial review standard, "judicial review of factual challenges to CAT orders must be highly deferential." *Nasrallah v. Barr*, 590 U.S. 573, 576 (2020). "Demonstrating torture requires a much greater showing of harm than demonstrating persecution, itself 'an extreme concept.'" *Hernandez v. Garland*, 52 F.4th 757, 769 (9th Cir. 2022) (citation omitted).

To obtain relief, Fuentes-Pineda must show he "more likely than not" would be tortured if removed to El Salvador. 8 C.F.R. §§ 1208.16(c),

---

[1] Fuentes-Pineda was removed to El Salvador on January 14, 2025, after his motion for an emergency stay of removal was denied by this court. But his petition for review is not moot because he would incur adverse "collateral legal consequences" if the BIA's order is upheld. *Mendoza-Flores v. Rosen*, 983 F.3d 845, 847 (5th Cir. 2020). Specifically, Fuentes-Pineda may suffer an automatic period of inadmissibility for the next decade. *See* 8 U.S.C. §§ 1182(a)(9)(A)(ii)(II), 1229a. We therefore have jurisdiction. *See Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021).

1208.17. And he must show that the torture involved "sufficient state action." *Aviles-Tavera v. Garland*, 22 F.4th 478, 486 (5th Cir. 2022).

Under the regulations implementing the CAT, "torture" is defined as "severe pain or suffering, whether physical or mental," that is "intentionally inflicted" to "intimidate or coerce" an individual "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Morales-Morales v. Barr*, 933 F.3d 456, 464 (5th Cir. 2019) (cleaned up) (quoting § 1208.16(c)(2)).

So any harm must be intentionally inflicted to constitute torture. Negligent conduct, or substantial certainty that harm will result, does not suffice if the harm is not specifically intended. For this reason, "even cruel and inhuman behavior by government officials may not implicate the torture regulations." *Sevoian v. Ashcroft*, 290 F.3d 166, 175 (3rd Cir. 2002).

We will overturn factual findings on these issues only when "the evidence is so compelling that no reasonable fact finder could fail to find the petitioner statutorily eligible for relief." *Munoz-Granados v. Barr*, 958 F.3d 402, 406 (5th Cir. 2020). Thus, we will not reverse the BIA's findings on eligibility for CAT protection "unless we decide 'not only that the evidence supports a contrary conclusion, but [also] that the evidence *compels* it.'" *Zhang v. Gonzales*, 432 F.3d 339, 344 (5th Cir. 2005) (citations omitted).

## A.

To start, Fuentes-Pineda argues the IJ did not make a finding regarding whether El Salvador is intentionally using substandard prison conditions to inflict torture. We disagree. The IJ noted that "the [BIA] remanded for further consideration of whether any poor or life-threatening prison conditions are intentionally and deliberately intended to inflict torture." The opinion concluded the "evidence is not sufficient to show that

4

the dismal and harmful conditions of detention [are] specifically intended to torture." The IJ thus clearly made a finding.

**B.**

The IJ conducted a diligent review of the record in evaluating Fuentes-Pineda's CAT claim. The opinion appropriately applied longstanding BIA precedent in *Matter of J-E-*, 23 I. & N. Dec. 291 (BIA 2002) (en banc), to make well supported findings about the conditions in Salvadoran prisons. Nothing in the record compels us to find that the prison conditions are intended to inflict torture.

*Matter of J-E-* explained when harsh prison conditions can constitute intentional infliction of torture under the CAT. "In order to constitute torture, the act must be *specifically intended* to inflict severe pain or suffering." *Id.* at 300. "[T]his specific intent requirement is taken directly from . . . the Senate's ratification resolution [of the CAT]." *Id.* at 298. Under this standard, even "rough and deplorable treatment . . . does *not* amount to torture." *Id.* Likewise, evidence of "isolated acts of torture" in prisons is "insufficient." *Id.* at 303.

Relying on *Matter of J-E-*, the IJ found that there was a possibility, but not a clear probability, that Fuentes-Pineda would be tortured. The IJ found that pursuant to El Salvador's "state of exception"—a public safety policy enacted to address severe gang violence—Fuentes-Pineda would likely be detained and imprisoned upon his arrival.

The IJ's detailed opinion appreciated that Fuentes-Pineda would likely "be subjected to poor and life-threatening conditions" during his imprisonment. But the opinion also correctly acknowledged that "[s]ubstandard prison conditions are not torture." "[C]ruel, inhuman, or degrading" punishment that "does not cause severe physical or mental pain or suffering" is not "torture" under the CAT.

The IJ was also "unable to speculate" that deaths in Salvadoran prisons were "the result of extreme cruel and inhuman treatment rather than other causes such as substandard conditions of prison." For instance, the IJ found 132 deaths were reported in Salvadoran prisons. But "[e]ven factoring under reporting, rate of deaths by themselves do not indicate a clear probability especially when considering the overall number of detainees." Considering that over 70,000 people have been detained by the Salvadoran government, that number of deaths in the context of so many detainees was insufficient to show intent to torture, in the IJ's view.

The IJ further found that "evidence that the government is attempting to obfuscate the number of deaths does not necessarily indicate these deaths were specifically intended." To the contrary, the IJ concluded there was a "strong possibility that these deaths were the result of negligence caused by the overcrowded conditions." But "deliberatively detaining persons in overcrowded conditions does not necessarily provide sufficient evidence of the specific intent to torture."

The IJ also reviewed an Amnesty International report on El Salvador's prisons that stated torture was a common practice based on interviews with former detainees. But the IJ reasoned that "common does not necessarily indicate more likely than not," and observed that only 83 people were interviewed for the report.

Moreover, we have warned that reports like these may "reflect not consensus, but merely one side in a sharply contested [] debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). As our sister circuit has observed, "these organizations may have their own agendas." *M.A. v. INS*, 899 F.2d 304, 313 (4th Cir. 1990) (en banc).

Additionally, the IJ considered statements by Salvadoran officials and concluded they did not establish a clear probability of intent to torture. The

IJ stated "there is evidence that the government frequently advertises on social media the overcrowded conditions and lack of adequate food as appropriate treatment for gang members."  Similarly, the IJ noted some officials' statements suggest that the government will not prosecute those who kill gang members.

Nonetheless, the IJ concluded "this evidence is not sufficient to show that the dismal and harmful conditions of detention [are] specifically intended to torture."  Reviewing the record, the IJ observed that other facts suggested that "the government does prosecute some officials for committing torture."  And "[a]dditional training in human rights practices [has] also been provided."

The IJ's conclusion was substantially justified, in light of this evidence.  "Advertising the poor conditions as a deterrent to criminal conduct is not inconsistent with attempts to improve those conditions as they currently exist."  *Matter of A-A-R-*, 29 I. & N. Dec. 38, 44 n.2 (BIA 2025).  Rather than demonstrating an intent to torture, social media statements by individuals like Salvadoran President Nayib Bukele can be read as "reflect[ing] the public officials' moral judgment about gang members."  *Id.* at 45.  Such statements may be seen as "serv[ing] political purposes and garner[ing] public support, as well as . . . deter[ring] individuals in the community from engaging in gang activity."  *Id.*

Finally, the U.S. Department of State's 2023 country conditions report for El Salvador "states that although the Salvadoran Government is aware of the harsh prison conditions, it is taking 'credible steps to . . . punish officials who may have committed human rights abuses.'"  *Id.* at 44.  Indeed, the latest country report concludes that there are "no credible reports of significant human rights abuses," and again states "[t]he government took credible steps to identify and punish officials who committed human rights

No. 24-60592

abuses."  U.S. Dep't of State, *Country Report on Human Rights Practices for 2024*, https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/el-salvador.  These reports are "highly probative evidence." *Matter of A-A-R-*, 29 I. & N. Dec. at 44.  *See also Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir. 1995) (describing State Department country reports as "the most appropriate and perhaps the best resource" on country conditions).[2]

So although the IJ's opinion registered strong disagreement with the "arbitrary nature and excessive use of physical force" in El Salvador, it also reasonably emphasized that the Salvadoran government has "a legitimate national interest in addressing gang violence."

Considering this evidence, the IJ was unwilling to speculate that Salvadoran prison conditions are specifically intended to inflict torture.  We find no basis to upset these findings.

## C.

Fuentes-Pineda also asserts that the IJ erred by failing to consider how his past gang affiliation and police encounters increased his individual risk of torture.  But again, we discern no error in the IJ's findings that compels a contrary outcome.

---

[2] We may exercise our discretion to take judicial notice of a State Department country report when it establishes a change in country conditions "crucial to our decision." *Dobrota v. INS*, 195 F.3d 970, 973 (7th Cir. 1999). *See also Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006) (citing *Dobrota* to take judicial notice of a State Department country report).  We do so here, considering that "a remand would be futile in light of current conditions in [El Salvador] as reflected in the most recent State Department report." *Dobrota*, 195 F.3d at 974. *Cf. Maniar v. Garland*, 998 F.3d 235, 240 (5th Cir. 2021) (cleaned up) (noting our circuit's remand futility exception in certain immigration cases, where "there is no realistic possibility that the BIA would have reached a different conclusion").

Isolated instances of torture in prison do not establish a clear probability Fuentes-Pineda himself will be tortured. Nor is there sufficient evidence that "the majority of current or former gang members detained in El Salvador are likely to suffer harm satisfying the legal definition of torture, such that [Fuentes-Pineda] would need to show nothing more than gang affiliation and a likelihood of detention to meet his burden of proof." *Matter of A-A-R-*, 29 I. & N. Dec. at 42.

As the IJ found, neither Fuentes-Pineda's past instances of torture nor his gang affiliations show the government of El Salvador will target him over other gang members. The IJ determined it was "too speculative to find that the same officers who tortured [Fuentes-Pineda] will also be involved in his future arrest and detention." *Cf. Gonzales-Veliz v. Barr*, 938 F.3d 219, 225 (5th Cir. 2019) ("speculation alone is insufficient to compel a conclusion that is contrary to the IJ's finding"). For example, Fuentes-Pineda was not tortured while serving his previous 11-year prison term, and he had "other encounters with the police that resulted in mistreatment that did not rise to [the] level of torture."

Fuentes-Pineda responds that his prior torture was before El Salvador implemented its state of exception. But the evidence can be fairly read to tell a different story. The state of exception may instead *decrease* the risk Fuentes-Pineda would be singled out for torture. The government may now detain gang affiliates for any reason, diminishing the need to inflict harm to secure a confession.

\* \* \*

Substantial evidence supports the conclusion that El Salvador's harsh prison conditions aren't intentionally designed to inflict torture. And

nothing in Fuentes-Pineda's background compels us to reject the IJ's findings.

Accordingly, the petition is denied.